# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| L.E., by and through their parent and next friend, SARA CAVORLEY; B.B., a minor, by and through their parent and next friend, ELIZABETH BAIRD; A.Z., a minor, by and through their parent and next friend, JESSICA ZEIGLER; and C.S., a minor, by and through their parent and next friend, TARASHA SHIRLEY, | |
| Plaintiffs, | CIVIL ACTION NO: |
| v. | _____ |
| CHRIS RAGSDALE, in his official capacity as Superintendent of Cobb County School District; RANDY SCAMIHORN, in his official capacity as a member of the Cobb County Board of Education; DAVID BANKS, in his official capacity as member of the Cobb County School Board; DAVID CHASTAIN, in his official capacity as member of the Cobb County School Board; BRAD WHEELER, in his official capacity as member of the Cobb County School Board; JAHA HOWARD, in his official capacity as member of the Cobb County School Board; CHARISSE DAVIS, in her official capacity as member of the Cobb County School Board; LEROY TRE' HUTCHINS, in his official capacity as member of the Cobb County School Board; and COBB COUNTY SCHOOL DISTRICT, | **COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES**<br><br>JURY TRIAL DEMANDED |
| Defendants. | |

## PRELIMINARY STATEMENT

1.      Pediatric hospitalizations, deaths, and other long term negative health consequences of COVID-19 are preventable when families, communities, and schools collectively share responsibility to limit disease transmission. Plaintiffs bring this action because the Cobb County School District ("District"), led by Defendant Ragsdale and a majority of the Cobb County Board of Education ("Board"), refuse to do their part to protect Plaintiffs and ensure their access to a safe in-person learning environment.

2.      Plaintiffs L.E., B.B., A.Z., and C.S. (collectively, "Plaintiffs") are students with disabilities, enrolled in the District, who have underlying medical conditions that make them susceptible to experiencing serious illness or death if they contract COVID-19.

3.      The nation's health protection agency, the Centers for Disease Control and Prevention ("CDC"), developed research-based guidelines to prevent the spread of COVID-19 in schools, and the CDC guidelines are mirrored or endorsed by the American Academy of Pediatrics ("AAP"), the Georgia Department of Public Health ("GDPH"), and the Cobb & Douglas Public Health Department ("CDPH").

4.      The District previously endorsed and implemented protocols consistent with CDC guidelines to prevent COVID-19 transmission in schools, even arguing the importance of these protocols before this very Court in late April 2021.[1]

5.      In June 2021, Defendant Ragsdale reversed course, ending many of the District's COVID-19 safety protocols that the District defended as necessary to protect students just a few weeks prior.

6.      Since the start of the 2021-2022 academic year, the District has willfully refused and consistently failed to implement policies and practices that comply with current COVID-19 safety guidelines established by federal, state, and local public health experts, policies which require a multilayered approach to reduce virus transmission and risk.

7.      The District's current COVID-19 response jeopardizes the health and safety of more than 110,000 individuals in the District, approximately 15,000 of whom are students with disabilities, like Plaintiffs, as well as the District's employees and the entire Cobb County community.

---

[1] Def.'s Resp. in Opp'n to Pls.' Mot. For TRO, *W.S. ex rel. Sonderman v. Ragsdale*, No. 1:21-cv-01560-TWT (N.D. Ga. Apr. 29, 2021) (ECF No. 5) (arguing the need for a mask mandate and compliance with CDC guidelines given the severity of the COVID-19 virus in the District).

8.      Ignoring students, parents, and hundreds of medical professionals and public health experts, the District has refused to modify its current policies and practices to provide a safe in-person learning environment for Plaintiffs and other students like them.

9.      Because of the significant risks to Plaintiffs' health and safety created by the District's ineffective COVID-19 response, Plaintiffs can no longer attend school in-person.

10.     The District has the resources, research, and experience to create a safe and accessible in-person learning environment for Plaintiffs and other students with disabilities that make them vulnerable to COVID-19.

11.     Plaintiffs could attend school in-person if Defendants reasonably modified their policies and practices to create a safe in-person learning environment.

12.     Rather than using the known and available tools to mitigate the threat of COVID-19 and protect Plaintiffs' access to school services, programs, and activities, the District has acted with deliberate indifference to Plaintiffs' rights to inclusion, health, and education.

13.     Plaintiffs bring this action against Defendants for violating Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation

Act ("Section 504"), and Plaintiffs seek relief from this Court to ensure they receive the educational services, programs, and benefits to which they are legally entitled.

## JURISDICTION and VENUE

14.     This action arises under Title II of the ADA, 42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiffs' claims are authorized by 42 U.S.C. § 12133 and 29 U.S.C. § 794(a).

15.     Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction). Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as an actual controversy exists within this Court's jurisdiction.

16.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and Local Rule 3.1B(1)(a) because Defendants maintain their principal office within this district in Cobb County, Georgia, and the acts, omissions, and events giving rise to this action occurred in this district.

17.     This Court has personal jurisdiction of the parties under Fed. R. Civ. P. 4(k)(1)(A).

## PARTIES

18.     **Plaintiff L.E.** is a 13-year-old student enrolled in the seventh grade in the District. L.E. was diagnosed with acute myeloid leukemia ("AML") as an infant.

L.E. has undergone multiple rounds of chemotherapy, which has left his immune system severely compromised. He is diagnosed with hypogammaglobulinemia and receives weekly infusions in his abdomen to improve his immune system. The District has identified L.E. as a student with a disability eligible for services and accommodations. L.E. brings this action, by and through his parent and next friend, Sara Cavorley.

19.     **Plaintiff B.B.** is a 15-year-old student enrolled in the eighth grade in the District. B.B. is diagnosed with Duchenne Muscular Dystrophy ("DMD"). He is also diagnosed with Obsessive-Compulsive Disorder, Attention Deficit-Hyperactivity Disorder ("ADHD"), and Anxiety. To treat DMD, B.B. requires steroids which suppress his immune system. B.B. also has a weakened respiratory system. The District has identified B.B. as a student with a disability eligible for services and accommodations. B.B. brings this action, by and through his parent and next friend, Elizabeth Baird.

20.     **Plaintiff A.Z.** is a 7-year-old student enrolled in the first grade in the District. A.Z. is diagnosed with Bronchiectasis, an airway clearance impairment, and she has persistent asthma, chronic bronchitis, and recurring pneumonia. These recurrent episodes of respiratory illnesses severely limit A.Z.'s breathing without available medical care, medications, and treatments. The District has identified A.Z.

as a student with a disability eligible for services and accommodations. A.Z. brings this action, by and through her parent and next friend, Jessica Zeigler.

21.     **Plaintiff C.S.** is a 14-year-old student enrolled in the ninth grade in the District. C.S. is diagnosed with severe asthma and has a history of pneumonia and upper respiratory infections. The District has identified C.S. as a student with a disability eligible for services and accommodations. C.S. brings this action, by and through his parent and next friend, Tarasha Shirley.

22.     **Defendant Chris Ragsdale** is the Local Superintendent of the District and the executive officer of the Board. Defendant Ragsdale is responsible for implementing policy established by the Board and rules and regulations issued by the state, pursuant to Ga. Const. art. 8, § 5, ¶ III; O.C.G.A. §§ 20-2-61(a); 20-2-109. Defendant Ragsdale is responsible for the District's acts and omissions, and he is sued in his official capacity.

23.     **Defendant Randy Scamihorn** is a member of the Board and is responsible for the District's management and control, primarily through establishing policy, such as policies relating to infectious disease in schools, pursuant to Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61; Ga. Comp. R. & Regs. 160-1-3-.03(2)(a). Defendant Scamihorn is sued in his official capacity.

24.     **Defendant David Banks** is a member of the Board and is responsible for the District's management and control, primarily through establishing policy, such as policies relating to infectious disease in schools, pursuant to Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61; Ga. Comp. R. & Regs. 160-1-3-.03(2)(a). Defendant Banks is sued in his official capacity.

25.     **Defendant David Chastain** is a member of the Board and is responsible for the District's management and control, primarily through establishing policy, such as policies relating to infectious disease in schools, pursuant to Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61; Ga. Comp. R. & Regs. 160-1-3-.03(2)(a). Defendant Chastain is sued in his official capacity.

26.     **Defendant Brad Wheeler** is a member of the Board and is responsible for the District's management and control, primarily through establishing policy, such as policies relating to infectious disease in schools, pursuant to Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61; Ga. Comp. R. & Regs. 160-1-3-.03(2)(a). Defendant Wheeler is sued in his official capacity.

27.     **Defendant Jaha Howard** is a member of the Board and is responsible for the District's management and control, primarily through establishing policy, such as policies relating to infectious disease in schools, pursuant to Ga. Const. art.

8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61; Ga. Comp. R. & Regs. 160-1-3-.03(2)(a). Defendant Howard is sued in his official capacity.

28.    **Defendant Charisse Davis** is a member of the Board and is responsible for the District's management and control, primarily through establishing policy, such as policies relating to infectious disease in schools, pursuant to Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61; Ga. Comp. R. & Regs. 160-1-3-.03(2)(a). Defendant Davis is sued in her official capacity.

29.    **Defendant Leroy Tre' Hutchins** is a member of the Board and is responsible for the District's management and control, primarily through establishing policy, such as policies relating to infectious disease in schools, pursuant to Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61; Ga. Comp. R. & Regs. 160-1-3-.03(2)(a). Defendant Hutchins is sued in his official capacity.

30.    **Defendant Cobb County School District** ("District") is the public school system of Cobb County, Georgia, under the control and management of the Cobb County Board of Education, pursuant to Ga. Const. art. 8, § 5, ¶ I; O.C.G.A. § 20-2-50. The District meets the definition of a public entity under 42 U.S.C. § 12131, and receives federal financial assistance under 29 U.S.C. § 794.

## FACTUAL ALLEGATIONS

The COVID-19 virus and the Delta variant present ongoing risks

31.    The COVID-19 virus is an infectious disease that has caused an ongoing global pandemic, resulting in more than 691,500 deaths in the United States, more than 25,757 deaths in Georgia, and more than 1,150 deaths in Cobb County.

32.    Vaccines against COVID-19 are now available and are both highly efficacious and effective against infection and symptoms; however, children under the age of twelve are ineligible to be vaccinated against COVID-19.

33.    Despite the availability of vaccines, COVID-19 continues to spread. Since August 2021, Georgia has experienced a significant increase in COVID-19 cases, driven by the spread of the "Delta variant."

34.    On August 19, 2021, the Cobb County Board of Commissioners declared a local state of emergency due to the recent surge of the Delta variant and the high transmission rates in Cobb County. The state of emergency was extended on September 17 through October 17.

35.    As of September 20, 2021, 98% of Georgia patient specimens of COVID-19 sent for testing were identified as the Delta variant. The Delta variant is more dangerous than other variants because of its heightened transmissibility between infected and noninfected persons.

36.     The greatest risk of Delta variant transmission is among unvaccinated people, who are significantly more likely to contract and transmit the virus, including children.

37.     Only 54% of Cobb County residents are–as of the date of this filing– vaccinated against COVID-19.

38.     As of the date of this filing, Cobb County is considered an area of "high transmission," the CDC's most severe category of transmission, and the COVID-19 transmission rate is approximately six times as high as it was in September 2020.

39.     Between September 4 and 17, 2021, Cobb County reported 4,544 total positive COVID-19 cases, which is a confirmed new case rate of 600 per 100,000.

40.     Due to the Delta variant and the inability of children under twelve to be vaccinated, pediatric cases of COVID-19 have increased.

41.     Between September 9 and 16, 2021, 225,978 children contracted COVID-19 in the United States, representing 25.7% of the weekly reported cases.

42.     Georgia reported the eleventh highest number of cumulative COVID-19 cases for children in the United States between September 9 and 16, 2021, reporting 8,606 new cases in children.

43.     On September 23, 2021, the GDPH reported that Cobb County had 1,063 COVID-19 cases among children aged five to seventeen during the prior two

weeks. Compared to approximately the same two-week period in 2020, the fourteen-day case rate among the same population of children was 1050% higher.

44.    These numbers do not reflect all positive COVID-19 cases among children and adolescents in Georgia. Although Georgia is undercounting positive COVID-19 data across all age groups, the problem is the worst for children from twelve to seventeen years old children, followed by children from five to eleven years old.

45.    As of the date of this filing, the reported case rate among K-12 aged children in Cobb County is more than twice as high as the U.S. Department of Health and Human Services' "dark red" zone classification.

46.    Children who contract COVID-19 are at risk for developing Multisystem Inflammatory Syndrome in Children (MIS-C). Children ages 6-11 are most likely to develop MIS-C, which occurs when multiple organs become inflamed, including the heart, lungs, kidneys, brain, skin, eyes, or gastrointestinal organs. These children often end up in the ICU. During the 2021 summer, MIS-C cases rose exponentially as the Delta variant spread. Even children who contract mild cases of COVID-19 are at risk for MIS-C.

47.    As of the date of this filing, pediatric hospitalizations have recently reached an all-time high since the beginning of the pandemic.

48.     Since March 2020, approximately one in four hospitalized children and adolescents with COVID-19 has required intensive care.

49.     Four children died in Cobb County from COVID-19 in August 2021.

Children with disabilities are at an increased risk for severe illness

50.     Countless studies and public health experts confirm that the Delta variant poses a more serious risk to children with disabilities and underlying medical conditions, like Plaintiffs.

51.     The rate of hospitalization, severe illness, and death from COVID-19 in children with underlying conditions, including asthma, obesity, heart disease, cancer, chromosomal disorders, and congenital malformations, is significantly higher than that of children with no underlying conditions.

52.     According to the CDC, "[c]hildren with underlying medical conditions are at an increased risk for severe illness compared to children without underlying medical conditions." The CDC defines "severe illness" from COVID-19 as when a person needs hospitalization, intensive care, or the use of a ventilator to assist with breathing, or the person may die.

53.     In general, children with severe COVID-19 may develop respiratory failure, myocarditis, shock, acute renal failure, coagulopathy, and multi-organ

system failure. Some children with COVID-19 have developed other serious problems like intussusception or diabetic ketoacidosis.

54.     According to the CDC, underlying disabilities or medical needs that place children at increased risk of "severe illness" from COVID-19 include "medical complexity, with genetic, neurologic, metabolic conditions, or congenital heart disease." And "children with obesity, diabetes, asthma or chronic lung disease, sickle cell disease, or immunosuppression can be at increased risk for severe illness from COVID-19." The CDC emphasizes that those who are immunocompromised are more likely to get severely ill from COVID-19 and may not be fully protected even when they are vaccinated.

55.     Other types of disabilities can expose some individuals to an increased risk of contracting COVID-19 or having an unrecognized illness, such as people with limited mobility who cannot avoid close contact, people who have trouble understanding information or practicing preventive measures on their own, and people who may not be able to communicate symptoms of illness.[2]

---

[2] *People with Disabilities*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated June 21, 2021), https://www.cdc.gov/ncbddd/humandevelopment/covid-19/people-with-disabilities.html.

56.    Plaintiff children are among those individuals at increased risk of severe illness, hospitalization, or death from COVID-19, and especially the Delta variant.

### COVID-19 transmission can be reduced for children in schools by following guidance from epidemiologists and medical professionals

57.    The risk of exposure to and transmission of COVID-19 in K-12 schools is significant. At school, students spend long periods of time in proximity to one another and school staff, resulting in frequent exposure to pathogens.

58.    As of September 27, 2021, according to the COVID-19 Event Risk Assessment Tool developed by the Georgia Institute of Technology, in Cobb County specifically, the risk of being exposed to COVID-19 in a group of twenty-five people, like in a classroom, is estimated to be 41%. For a gathering of one hundred people, like in a K-12 cafeteria, the risk is estimated to be 88%. For a gathering of 500 people, like in a school assembly, the risk is estimated to be over 99% -- a virtual certainty.

59.    However, experts agree that it is possible to mitigate the spread of COVID-19 in schools to allow students the benefit of in-person learning.

60.    According to the CDC, students "benefit from in-person learning, and safely returning to in-person instruction in the fall 2021 is a priority." The American Academy of Pediatrics ("AAP"), the American Medical Association, the Infectious

Disease Society of America, and the American Academy of Family Physicians all also strongly endorse return to in-person learning. According to the AAP, many families with children with disabilities did not have adequate educational support during remote learning, and educational disparities have worsened for children with disabilities.

61.    Public health authorities have been unambiguous and unanimous about the need for implementation of appropriate public health mitigation strategies, including universal indoor masking, to keep students safe during in-person learning.

62.    While no single existing mitigation strategy is perfect at preventing COVID-19 illness, the best protection for children in schools requires layered mitigation strategies that include COVID-19 vaccinations, universal and appropriate masking, physical distancing, improved ventilation, surveillance testing, symptom screenings, isolation and effective quarantine measures, and contact tracing.

63.    The CDC issued updated Guidance for COVID-19 Prevention in K-12 Schools on August 4, 2021 ("CDC guidelines").[3] The CDC guidelines recommend:

---

[3] *Guidance for COVID-19 Prevention in K-12 Schools*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Aug. 5, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

a. Promoting COVID-19 vaccinations, as "vaccination among all eligible students as well as teachers, staff, and household members is the most critical strategy to help school safely resume full operations."

b. Universal indoor masking "for all individuals age 2 years and older including students, teachers, staff, and visitors, regardless of vaccination status." Further, "[p]assengers and drivers must wear masks on school buses," pursuant to CDC Order, 86 Fed. Reg. 8025-01.

c. Distancing of "at least 3 feet of physical distance between students within classrooms, combined with indoor mask wearing to reduce transmission risk," and "at least 6 feet between students and teachers/staff, and between teachers/staff."

d. Screen testing to identify infected people so that measures can be taken to prevent further spread.

e. Improving ventilation "is an important COVID-19 prevention strategy that can reduce the number of virus particles in the air."

f. Teaching and reinforcing handwashing and respiratory etiquette to help keep individuals from getting and spreading COVID-19.

g. Staying home when sick and getting tested "is essential to keep COVID-19 infections out of school and prevent the spread to others." Schools should allow flexible, non-punitive, supportive leave policies, and excused absences for sick workers and students.

h. Contact tracing in combination with isolation and quarantine to report and collaborate with state and local health departments.

i. Reducing the risk of spread by sufficiently cleaning and disinfecting surfaces.

j. Given the highly contagious Delta variant, the CDC also recommends "fully vaccinated people who have a known exposure to someone with suspected or confirmed COVID-19 to be tested 3-5 days after exposure, regardless of whether they have symptoms."

k. Utilize adaptations and alterations to preventive strategies when serving people with disabilities, while maintaining efforts to protect all children and staff from COVID-19.

64.    The CDC guidelines state that federal funds provided through the Elementary and Secondary School Emergency Relief (ESSER) Fund should go towards supporting preventive strategies, such as improvements to ventilation and resources for screen testing programs.

18

65.    The AAP also released guidance that reiterates the CDC guidelines.[4]

66.    The AAP has stated that "[s]chools must continue to take a multi-pronged, layered approach to protect students, teachers, and staff (*i.e.*, vaccination, universal mask use, ventilation, testing, quarantining, and cleaning and disinfecting). Combining these layers of protection will make in-person learning safe and possible. Schools should monitor the implementation and effectiveness of these policies."

67.    In an Open Letter to Georgia School Superintendents, the Georgia Chapter of the AAP requested Georgia school districts to implement AAP and CDC guidelines.

68.    The GDPH has stated the importance of implementing CDC guidelines to stop the spread of COVID-19 in early childcare and education programs.

69.    The Cobb County Board of Health ("CBOH") has adopted a position statement endorsing CDC and AAP guidelines in all Cobb County schools.

70.    Hundreds of doctors and medical professionals have requested the District to implement CDC guidelines to reduce virus transmission.

---

[4] *Covid-19 Guidance for Safe Schools*, AMERICAN ACADEMY OF PEDIATRICS (last updated July 18, 2021), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/.

71.     On September 24, 2021, the CDC released its first analysis of the impact of universal indoor masking requirements in schools for the 2021-2022 school year. The analysis found that "the odds of a school-associated COVID-19 outbreak in schools without a mask requirement were 3.5 times higher than those in schools with an early mask requirement."

<u>Plaintiff children are unable to attend school in person because of the increased risk caused by the District's failure and refusal to implement CDC guidelines</u>

72.     Despite the abundance of available guidance from federal, state, and local public health authorities and medical experts regarding preventing the spread of COVID-19 in schools, Defendants have not implemented this guidance in the District.

73.     Since the 2021-2022 school year began in August 2021, as of September 24, 2021, the District has reported 5,372 positive COVID-19 cases in Cobb County schools.

74.     The high number of COVID-19 cases in the District, alongside the lack of COVID-19 safety and prevention measures in schools, creates an unreasonably dangerous school environment for Plaintiffs.

75.     Because of the risk to their health and safety, Plaintiffs can no longer attend school.

76.     Plaintiff children have requested that Defendants implement effective COVID-19 safety protocols – like they did last year – so that they can go to school. But those requests have been denied or ignored.

77.     Now, Plaintiffs are at home, isolated away from their peers, where they receive an inadequate virtual education or no education at all.

**Plaintiff L.E.**

78.     L.E. is a 13-year-old child who was diagnosed with acute myeloid leukemia ("AML") as an infant. His current diagnosis is hypogammaglobulinemia. L.E.'s chemotherapy regimen has weakened his immune system causing him frequent illness. L.E. regularly has fevers and constant pain in his limbs and back. His weakened immune system increases the risk that he will get severely ill or die if he contracts COVID-19.

79.     L.E. is a seventh-grade student enrolled in the District.

80.     The District has identified L.E. as a student with a disability in need of special education services and accommodations.

81.     L.E. is severely immunocompromised; even before the pandemic, the school nurse would notify L.E.'s mother, Sara Cavorley, of the annual flu outbreaks so that L.E. could take appropriate precautions.

82.     During the 2020-2021 school year, Ms. Cavorley registered L.E. for virtual learning because he was ineligible for the COVID-19 vaccine.

83.     L.E. was vaccinated prior to the 2021-2022 school year, and his doctors approved him returning to school in-person so long as the 2020-2021 safety protocols were in place, namely universal masking, plexiglass between students, and social distancing. L.E.'s doctors advised against him attending school in-person if the District discontinued those safety protocols.

84.     Because the District discontinued its 2020-2021 safety protocols for the 2021-2022 school year, Ms. Cavorley removed L.E. from in-person school and requested Hospital/Homebound ("HHB") services for him.

85.     On several occasions, before removing L.E. from in-person school, Ms. Cavorley requested that the District implement CDC guidelines for the 2021-2022 school year so that L.E. could safely attend school in-person with his peers. The District refused.

86.     HHB services are designed to be temporary and provide continuity of educational services between the classroom and home or hospital for students in public schools whose medical needs, either physical or psychiatric, do not allow them to attend school for a limited time. HHB is not an appropriate placement for a child who could attend school in-person with reasonable modifications.

87.     L.E. now only receives five hours of instruction per week at home, where he is isolated from his peers. The District offers no flexibility due to the District's short staffed HHB program.

88.     On or around August 26, 2021, Ms. Cavorley emailed the assistant principal at L.E.'s school, explaining that he is only using HHB services because the District refuses to implement adequate safety measures like masking and social distancing.

89.     When the District sent L.E.'s siblings close contact notifications in two consecutive weeks, Ms. Cavorley stopped her other four children from attending school in-person to protect L.E.

90.     The District then sent Ms. Cavorley a notice threatening to disenroll her children which prompted her to send L.E.'s siblings back to school in-person. L.E.'s siblings now attend school fearful of bringing COVID-19 home to L.E.

91.     L.E. is being denied access to in-person education opportunities because of his disability.

92.     If Defendants implemented CDC guidelines and adequate COVID-19 safety protocols, L.E. could attend school in-person and access an in-person education like his nondisabled peers.

93.     Defendants' actions have and continue to irreparably harm L.E.

94.    Defendants have caused L.E. educational and actual harm.

95.    Due to Defendants' actions, L.E. is entitled to declaratory relief, preliminary and permanent injunctive relief, and actual and nominal damages.

**Plaintiff B.B.**

96.    B.B. is a 15-year-old child diagnosed with Duchenne Muscular Dystrophy ("DMD"), which is a terminal disease that causes muscle weakness and requires him to be in a wheelchair.

97.    B.B. is an eighth-grade student enrolled in the District.

98.    The District has identified B.B. as a student with a disability in need of special education services and accommodations.

99.    B.B.'s treatment for DMD includes steroids, which make him immunocompromised. B.B.'s weakened immune system increases the risk that he will get severely ill or die if he contracts COVID-19.

100.    The onset of DMD symptoms usually begins between ages 2 and 3. DMD first affects the proximal muscles, then the limb muscles, then later, the heart and respiratory muscles. DMD can result in impaired pulmonary function, which can then lead to acute respiratory failure.

101.    B.B.'s physician determined that it was too dangerous to send B.B. to school in-person because of the District's lack of adequate safety measures.

102. B.B.'s parent, Elizabeth Baird, through many communications, requested that the District accommodate B.B.'s disability by following CDC guidelines to allow him to attend school in-person. The District refused.

103. Ms. Baird then requested HHB services on or around September 8, 2021, as an accommodation.

104. On or around September 13, 2021, the District denied Ms. Baird's request for HHB services, claiming that HHB is "not appropriate for COVID concerns."

105. B.B. is currently not attending school and is not receiving any educational services.

106. B.B. is being denied access to in-person education opportunities because of his disability.

107. If Defendants implemented CDC Guidelines and adequate COVID-19 safety protocols, B.B. could attend school in-person and access an in-person education like his nondisabled peers.

108. Defendants' actions have and continue to irreparably harm B.B.

109. Defendants have caused B.B. educational and actual harm.

110. Due to Defendants' violations, B.B. is entitled to declaratory relief, preliminary and permanent injunctive relief, and actual and nominal damages.

**Plaintiff A.Z.**

111.   A.Z. is a 7-year-old child diagnosed with Bronchiectasis, an airway clearance impairment. She has persistent asthma, chronic bronchitis, and recurring pneumonia. A.Z. has undergone numerous tests and invasive procedures, but the root cause of her recurring symptoms is still unknown. A.Z. undergoes aggressive airway clearance therapy and daily medications.

112.   A.Z. is a first-grade student enrolled in the District

113.   The District has identified her as a student with a disability in need of accommodations.

114.   A.Z. began the 2021-2022 school year in-person.

115.   A few days into the school year, A.Z.'s mother, Jessica Zeigler, learned that the District did not mandate masks on school buses, so Ms. Zeigler began driving A.Z. to and from school.

116.   On or around August 16, 2021, A.Z. awoke with a fever and caught pneumonia—the second infection in less than a year.

117.   On or around August 31, 2021, A.Z.'s doctor advised Ms. Zeigler that A.Z. should not attend school in-person based on the District's lack of safety protocols.

118.   Ms. Zeigler requested accommodations to allow A.Z. to safely return to school in-person. The District denied her requests.

119.   A.Z. has not attended school in-person since August 13, 2021.

120.   A.Z. is being denied access to in-person education opportunities because of her disability.

121.   If Defendants implemented CDC guidelines and adequate COVID-19 safety protocols, A.Z. could attend school in-person and access a public education like her nondisabled peers.

122.   Defendants' actions have and continue to irreparably harm A.Z.

123.   Defendants have caused A.Z. educational and actual harm.

124.   Due to Defendants' violations, A.Z. is entitled to declaratory relief, preliminary and permanent injunctive relief, and actual and nominal damages.

**Plaintiff C.S.**

125.   C.S. is a 14-year-old child diagnosed with severe asthma. C.S. has a history of pneumonia and upper respiratory infection.

126.   C.S. is a ninth-grade student enrolled in the District.

127.   The District has identified C.S. as a student with a disability in need of accommodations.

128.   After learning that the District would not follow CDC guidelines in the 2021-2022 school year, C.S. started the school year in a "hybrid learning" model—two classes of in-person learning at school and three classes of remote learning at home, due to his disability.

129.   At the beginning of the school year, when he attended school in-person, few people in C.S.'s school wore masks and participated in physical distancing, particularly during group projects, in crowded hallways, and in the lunchroom.

130.   To protect C.S., his mother, Tarasha Shirley, requested a meeting to seek implementation of CDC guidelines and other safety protocols in school. Because of the length of time needed to conduct a meeting and the increasing threat to C.S.'s safety, Ms. Shirley withdrew C.S. from attending school in-person and C.S. now attends school virtually full time.

131.   C.S. has not attended school in-person since August 13, 2021.

132.   C.S. struggles with virtual learning because he must teach himself the material and he lacks peer interactions.

133.   C.S. is unable to participate in critical testing at school because there are no CDC guidelines or other safety protocols at the school testing sites, which will effect C.S.'s secondary educational opportunities.

134.   C.S. is being denied access to in-person education opportunities because of his disability.

135.   If Defendants implemented CDC guidelines and adequate COVID-19 safety protocols, C.S. could attend school in-person and access a public education like his nondisabled peers.

136.   Defendants' actions have and continue to irreparably harm C.S.

137.   Defendants have caused C.S. educational and actual harm.

138.   Due to Defendants' violations, C.S. is entitled to declaratory and preliminary and permanent injunctive relief, as well as actual and nominal damages.

<u>The District willfully and consistently fails to mitigate</u>
<u>COVID-19 transmission in its schools</u>

139.   Dating back to November 2020, immediately after the Board's most recent election, the Board's four majority members changed the Board's policy to increase the number of votes needed to add a meeting agenda item for discussion to four.

140.   The Board, consisting of seven total members, is racially and politically divided with four white Republican members and three Black Democrat members.

141.   The Board's November 2020 policy change has silenced the minority board members and their constituents by denying them the opportunity to add an

agenda item for discussion, including COVID-19 safety protocols, without a majority member vote.

142.   Defendants Ragsdale, Scamihorn, Chastain, Banks, and Wheeler, the District's superintendent and four majority board members respectively, have abdicated their duty to implement, or even consider and discuss, adequate COVID-19 safety protocols that would allow Plaintiffs and other students with disabilities to safely access an in-person education during the 2021-2022 school year.

143.   During the 2020-2021 school year, the District reopened schools for in-person learning after nearly seven months of remote learning.

144.   Defendants implemented safety measures to prevent the spread of COVID-19 in the District's 2020-2021 Re-Opening Plan, which included mandatory masking indoors and on buses, social distancing in classrooms and during lunch, and daily cleaning and hygienic practices.

145.   The 2020-2021 Re-Opening Plan did not interrupt, interfere with, or unduly burden the District's day-to-day functioning during the 2020-2021 school year.

146.   During the spring of 2021, students and families in the District were offered the option to select between in-person or virtual learning for the 2021-2022 school year.

147.   Between March 22, 2021, and April 1, 2021, middle and high school students could exercise the option for virtual school in the 2021-2022 school year.

148.   Between April 19, 2021, and May 2, 2021, elementary students could exercise the option for virtual school in the 2021-2022 school year.

149.   To help inform students' decision for the 2021-2022 school year, the District published a "Frequently Asked Questions" document which indicated that the District "will continue to follow the guidelines set forth by the CDC and Cobb Douglas County Health Department" if a student attends school in-person during the 2021-2022 school year.

150.   Based on the District's statements coupled with downward trending transmission rates at that time, approximately 97% of the District's students selected in-person school for the 2021-2022 school year, including Plaintiffs.

151.   On April 29, 2021, in a filing with this Court, the District vigorously defended its 2020-2021 Re-Opening Plan, including its mandatory indoor masking policy, in response to a lawsuit challenging the District's policies.

152. In its April 29, 2021 filing, the District argued that the plaintiffs bringing the lawsuit "favor their own interests over the public's wellbeing, [and] ignore recommendations from health experts at every level of government[.]"[5]

153. The plaintiffs dismissed the lawsuit in May 2021 after this Court denied their motion to enjoin the District's mandatory indoor masking policy.[6]

154. In subsequent months throughout the summer of 2021, as the Delta variant continued to spread, COVID-19 safety and mitigation protocols were not included on the Board's respective meeting agendas because the majority members refused to discuss them.

155. For example, during the Board's May 20, 2021, work session, Defendant Howard requested that a future board meeting agenda include a presentation by the CDPH on effective COVID-19 mitigation strategies. This was not the first time Defendant Howard had made this request. However, the majority members, as of the date of this filing, have refused to include the presentation on any subsequent meeting agenda.

---

[5] Def.'s Resp. in Opp'n to Pls.' Mot. For TRO, at 2, *W.S. ex rel. Sonderman v. Ragsdale*, No. 1:21-cv-01560-TWT (N.D. Ga. Apr. 29, 2021) (ECF No. 5).
[6] *See W.S. v. Ragsdale*, No. 1:21-cv-01560-TWT, 2021 WL 2024687 (N.D. Ga. May 12, 2021) (denying request to temporarily restrain the District from enforcing face masks).

156.   On May 25, 2021, the District applied for federal funds under the American Rescue Plan ("ARP") to be used in response to the impact of the COVID-19 pandemic on students.

157.   Congress requires that ARP funds be used to reopen schools safely given the risks presented by COVID-19, and to provide students and teachers with resources for alleviating the pandemic's negative impact on education, including support for students with disabilities.

158.   Congress also directed states and local districts accepting ARP funding to adopt ARP plans aligned with CDC guidelines to ensure a safe return to in-person instruction and continuity of educational services.

159.   The District's ARP application referenced its 2020-2021 Re-Opening Plan as a roadmap for how it would spend the funds it received.

160.   On or around June 1, 2021, Defendant Ragsdale officially announced that "masks will be optional for all Cobb County School District students and staff" effective on June 7, 2021.

161.   Defendant Ragsdale then introduced the 2021-2022 Public Health Protocols ("21-22 Protocols"), as written, which includes the following:

    a.  No mandatory or strongly encouraged vaccinations for students and staff members.

33

b.  Optional masks for students and staff, although strongly encouraged, in school buildings, on school buses, and at extracurricular activities.

c.  Students who are exposed to COVID-19 but asymptomatic may return to class after three days if they wear a mask for an additional seven days after exposure.

d.  Any student or staff member who tests positive for COVID-19 must isolate in accordance with GDPH guidelines.

e.  Social distancing and limits on large group gatherings will occur "when appropriate and feasible."

f.  Hand sanitizer, encouragement of frequent handwashing, daily cleaning of high touch surfaces, and disinfecting of school buses will be provided.

g.  The school will contact a student's parent/guardian if the student is identified as a close contact, and the Cobb COVID-19 website will be updated each Friday with positive/active COVID-19 cases.

h.  If a student exhibits COVID-19 symptoms while in the school clinic, the nurse has the discretion to request that the student wear a mask or isolate in a designated area after being assessed or waiting for parent pick-up.

34

i.  Non-staff volunteers are limited in their ability to enter school and volunteer in roles that involve proximity to students during school hours. Volunteers are still welcome on campus for after-school activities and special school events. No parents/guardians may eat lunch with their child in the school cafeteria.

162.   The 21-22 Protocols do not accommodate students with disabilities so that they can attend school in-person safely.

163.   The 21-22 Protocols directly conflict and do not require student compliance with or bus driver enforcement of the CDC's January 29, 2021, Order ("CDC Order") that mandates facial coverings on school buses, including in Georgia.

164.   On June 7, 2021, less than two weeks after submitting its ARP application, the District ended many of its safety protocols from the 2020-2021 Re-Opening Plan, including its mandatory indoor masking policy.

165.   The District did not allow students to subsequently modify their decisions to attend school in-person and opt for virtual learning after the District rescinded its statement that the District would follow CDC guidelines for the 2021-2022 school year.

166.   In July 2021, the District was granted more than $160 million in federal ARP funding to ensure that its students could safely access an in-person education.

167.   By way of information and belief at the time of filing, the District has not amended its ARP application as required to show that it did not follow its 2020-2021 Re-Opening Plan as originally stated.

168.   On August 19, 2021, the same day that Cobb County declared a local emergency due to COVID-19 high transmission rates, Defendant Ragsdale refused to meaningfully discuss COVID-19 mitigation strategies at the Board's monthly meeting, ignoring hundreds of calls from health and medical experts, parents, students, and community leaders asking the District to modify its policies and protect students.

169.   The Board's majority members also refused to add COVID-19 mitigation strategies to the August 19, 2021 meeting agenda or discuss the topic.

170.   Because COVID-19 safety protocols were not on the August 19, 2021, meeting agenda, Defendant Hutchins requested that the issue be added as an emergency exception to the Board's policy.

171.   Although the Board's policy allows for emergency items to be added late to the agenda, Defendant Scamihorn, the Board's chairperson, declared that

COVID-19 is "not an emergency," and prohibited a discussion of COVID-19 safety protocols at the August 19, 2021 meeting.

172.   When directly asked at the August 19, 2021 meeting, Defendant Scamihorn did not answer what constitutes an emergency.

173.   Defendant Ragsdale is one of eight members on the Cobb County Board of Health ("CBOH").

174.   Due to the District's rise of COVID-19 cases, the CBOH called an emergency meeting on September 7, 2021, to vote on a position statement endorsing CDC guidelines to prevent and mitigate the spread of COVID-19 in all Cobb County schools (public, private, and charter).

175.   Defendant Ragsdale abstained from the vote on the position statement at the September 7, 2021 CBOH meeting.

176.   Defendant Ragsdale was the only CBOH member not to support the position statement at the September 7, 2021 CBOH meeting.

177.   Dr. Janet Memark, District Director for the CDPH, in a September public statement, offered to present recommendations to the Board about COVID-19 safety protocols in the District, but the offer has not been accepted as of the date of this filing.

178.   On September 23, 2021, the Board conducted its monthly meeting, and COVID-19 safety protocols were not on the meeting agenda once again.

179.   At the Board's September 23, 2021, work session, prior to the Board's evening meeting, Defendants Scamihorn and Ragsdale did not disclose, even when asked, that Defendant Ragsdale would later present on COVID-19 during his public comments at the evening meeting.

180.   Because COVID-19 safety protocols were not on the September 23, 2021, meeting agenda, Defendants Davis, Howard, and Hutchins, the minority Board members, objected to the approval of the meeting agenda at the afternoon work session, but the agenda was approved by the majority members.

181.   Then, at the Board's evening meeting on September 23, 2021, Defendant Ragsdale gave an unannounced presentation on COVID-19.

182.   Relying on dubious research and cherry-picked data, Defendant Ragsdale attempted to promote the District's COVID-19 response as successful and to undermine the proven positive impact of complying with CDC guidelines.

183.   Because the presentation was not on the Board's meeting agenda, Defendant Howard sought to discuss the data and findings with Defendant Ragsdale during the meeting, but Defendant Scamihorn denied Defendant Howard's request.

184. Despite significantly higher transmission rates during August and September of 2021 compared to 2020, the District has not complied with current CDC guidelines as of the date of this filing.

185. Defendants know that children with disabilities are being denied access to school programs and services on account of their disabilities, and Defendants have the authority to adopt and implement COVID-19 safety protocols that would allow Plaintiffs to attend school.

186. Defendant's refusal to act despite this knowledge and authority is deliberately indifferent to Plaintiffs' right to attend school in-person with their nondisabled peers and causes ongoing harm to Plaintiffs.

<u>Defendants' conduct is causing ongoing harm to Plaintiffs</u>

187. Defendants' removal of safety measures and subsequent refusal to implement CDC guidelines to reduce and prevent the spread of COVID-19 in the District has denied Plaintiffs the opportunity to attend school safely.

188. Now, Plaintiffs languish at home, isolated from their peers, where they receive an inadequate, unequal education or no education at all. Because the District's conduct precludes Plaintiffs from the benefits of a free public education, Plaintiffs must attempt to find alternative education resources on their own.

189.   Because of Defendants' actions, Plaintiffs are being denied critical educational opportunities, including the social, emotional, and academic advantages of being in the classroom with their peers.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of Title II of the Americans with Disabilities Act
Against All Defendants**

190.   Plaintiff L.E. repeats and realleges paragraphs 31-95 and 139-189 in the foregoing paragraphs as if fully set forth herein.

191.   Plaintiff B.B. repeats and realleges paragraphs 31-77, 96-110, and 139-189 in the foregoing paragraphs as if fully set forth herein.

192.   Plaintiff A.Z. repeats and realleges paragraphs 31-77, 111-124, and 139-189 in the foregoing paragraphs as if fully set forth herein.

193.   Plaintiff C.S. repeats and realleges paragraphs 31-77 and 125-189 in the foregoing paragraphs as if fully set forth herein.

194.   Title II of the ADA prohibits discrimination in the provision and administration of public services and requires that persons with disabilities be afforded meaningful access to the programs and activities of public entities. 42 U.S.C. § 12132, *et seq*.

195.   Specifically, the ADA provides that "no qualified individual shall, by reason of such disability, be excluded from participation in or denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

196.   The ADA's implementing regulations prohibit public entities from, either directly or through contractual arrangements, utilizing any criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability or have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to people with disabilities. 34 § C.F.R. 35.130(b)(3)(i).

197.   The ADA imposes an affirmative obligation upon public entities to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities. . . ." *See* 42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 35.130(b)(7).

198.   The ADA's implementing regulations affirmatively obligate public entities to administer their services, programs, and activities in the most integrated

setting appropriate to the needs of qualified students with disabilities. 28 C.F.R. § 35.130(d).

199.   The District is a public entity as defined by the ADA.

200.   Plaintiffs are people with disabilities and are qualified individuals with disabilities as defined by the ADA.

201.   Plaintiffs are eligible to receive a public education in the District.

202.   Defendants are excluding Plaintiffs from participating in or denying them the benefits of public education, in violation of 29 U.S.C. § 794(a), 42 U.S.C. § 12132 and 28 C.F.R. § 35.130.

203.   Defendants are administering policies and practices that have the effect of excluding Plaintiffs from participation in public education, denying them the benefits of public education, or otherwise subjecting them to discrimination on the basis of their disability, in violation of 28 C.F.R. § 35.130(b)(3)(i).

204.   Defendants are failing to modify their policies, procedures, and operational practices under circumstances where such modification is necessary and required, in violation of 28 C.F.R. § 35.130(b)(7).

205.   Defendants are failing to administer their services, programs, and activities in the most integrated setting appropriate to the needs of Plaintiffs, in violation of 28 C.F.R. § 35.130(d).

206.   Defendants are administering policies and practices that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of Defendants' program with respect to Plaintiffs, in violation of 28 C.F.R. § 35.130(b)(3)(ii).

207.   Defendants' conduct constitutes discrimination against Plaintiffs by reason of their disabilities.

208.   Defendants' conduct is continuous and ongoing, in violation of the ADA.

209.   Defendants' conduct has caused Plaintiffs harm, and this harm will continue.

210.   Defendants' conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

## SECOND CAUSE OF ACTION
### Violation of Section 504 of the Rehabilitation Act
### Against All Defendants

211.   Plaintiff L.E. repeats and realleges paragraphs 31-95 and 139-189 in the foregoing paragraphs as if fully set forth herein.

212.   Plaintiff B.B. repeats and realleges paragraphs 31-77, 96-110, and 139-189 in the foregoing paragraphs as if fully set forth herein.

213.   Plaintiff A.Z. repeats and realleges paragraphs 31-77, 111-124, and 139-189 in the foregoing paragraphs as if fully set forth herein.

214.   Plaintiff C.S. repeats and realleges paragraphs 31-77 and 125-189 in the foregoing paragraphs as if fully set forth herein.

215.   Section 504 of the Rehabilitation Act prohibits discrimination by recipients of federal financial assistance.

216.   Defendants are recipients of federal financial assistance.

217.   Plaintiffs are children with disabilities as defined by Section 504.

218.   Plaintiffs meet the essential eligibility requirements to participate in public education through the District and receive Defendants' services, and are therefore qualified individuals with disabilities as defined by Section 504.

219.   Defendants are excluding Plaintiffs from participation in public education, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i).

220.   Defendants are administering policies and practices that have the effect of excluding Plaintiffs from participation in public education, denying them the benefits of public education, and subjecting them to discrimination on the basis of their disability. 34 C.F.R. § 104.4(b)(4).

221.   Defendants are administering policies and practices that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of Defendants program with respect to Plaintiffs, in violation of 34 C.F.R. § 104.4(b)(4).

222.   Defendants' conduct constitutes discrimination against Plaintiffs because of their disabilities.

223.   Defendants' conduct constitutes continuous and ongoing violations of Section 504.

224.   Defendants' conduct has caused educational and actual harm to Plaintiffs, and this harm will continue.

225.   Defendants' conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Accept jurisdiction of this lawsuit;

B.      Declare that Defendants' actions violate the ADA and Section 504 by denying Plaintiffs from meaningful access to educational benefits, and otherwise discriminating against Plaintiffs, based on their disabilities.

C.      Issue a preliminary and permanent injunction enjoining Defendants from violating the ADA and Section 504;

D.      Order Defendants to develop and implement policies, practices, procedures, and protocols for a multilayered COVID-19 mitigation strategy that follows existing CDC guidelines for COVID-19 Prevention in K-12 Schools to

accommodate Plaintiffs' disabilities and maintain consistency with CDC guidelines in the event of subsequent changes;

      E.     Award Plaintiffs nominal and actual damages;

      F.     Award Plaintiffs their reasonable attorneys' fees, costs, and expenses incurred;

      G.     Grant Plaintiffs a jury trial; and

      H.     Order and direct any and all other relief as this Court deems proper.

Respectfully submitted this 1st day of October, 2021.

**SOUTHERN POVERTY LAW CENTER**

/s/ *Michael J. Tafelski*
Michael J. Tafelski
Ga. Bar No. 507007
Eugene Choi
Ga. Bar No. 121626
Claire Sherburne
Ga. Bar No. 732244
Brock Boone (*pro hac vice* forthcoming)
Ala. Bar No. 2864-L11E
P.O. Box 1287
Decatur, GA 30031-1287
(334) 956-8273
michael.tafelski@splcenter.org
eugene.choi@splcenter.org
claire.sherburne@splcenter.org
brock.boone@splcenter.org

**LAW OFFICE OF ALLISON B. VROLIJK**

/s/ *Allison B. Vrolijk*
Allison B. Vrolijk
Ga. Bar No. 299360
885 Woodstock Road, Suite 430-318
Roswell, GA 30075
(770) 587-9228
allison@vrolijklaw.com

**GOODMARK LAW FIRM**

/s/ *Craig Goodmark*
Craig Goodmark
Ga. Bar No. 301428
1425 Dutch Valley Place, Suite A
Atlanta, GA 30324
(404) 719-4848
cgoodmark@gmail.com

**ATTORNEYS FOR PLAINTIFFS**