# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| L.E., by and through their parent and next friend, SARA CAVORLEY *et al.*, | CIVIL ACTION FILE NO: |
| *Plaintiffs*, | _____ |
| v. | |
| CHRIS RAGSDALE, in his official capacity as Superintendent of Cobb County School District *et al.*, | **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| *Defendants.* | |

Plaintiffs are children with disabilities and enrolled students in the Cobb County School District ("District"). Because of their disabilities, Plaintiffs are more susceptible to COVID-19 and its worst complications, including severe illness and death. The District's failure to execute multilayered COVID-19 spread mitigation strategies in its schools presents an immediate threat to Plaintiffs and prevents them from attending school in-person.

Federal law requires that Defendants adopt and modify policies and practices to allow Plaintiffs to safely access an equal in-person education alongside their nondisabled peers. However, Defendants refuse to implement basic protections and

spread-prevention measures, consistent with guidelines and best practices established by federal, state, and local public health officials, creating an unsafe in-person learning environment for Plaintiffs. As a result, Plaintiffs must choose between their public education or their health and safety.

## STATEMENT OF FACTS

### Ongoing COVID-19 Risks

Since August 2021, Georgia COVID-19 cases have skyrocketed because of the highly contagious Delta variant. (Schmidtke Decl. ¶ 8). Unvaccinated people, including children, are significantly more likely to contract, transmit, and experience severe symptomatic illness from the Delta variant. (Crater Decl. ¶ 24). Only 47% of Georgians have been fully vaccinated against COVID-19. (Schmidtke Decl. ¶ 14).

Cobb County, Georgia is currently under a local state of emergency, and intensive care units have been at or near capacity for much of August and September. (Crater Decl. ¶ 21; Herndon Decl. ¶ 18). The county's community transmission alert is "high" – the most severe category. (Herndon Decl. ¶ 16).

Children of all ages can and do contract and spread COVID-19, and most children under twelve years old remain ineligible for vaccination. (McLaughlin Decl. ¶¶ 16-19; Schmidtke Decl. ¶ 12). Child cases of COVID-19 have increased drastically with pediatric cases accounting for 25.7% of all weekly reported cases.

(McLaughlin Decl. ¶ 12; Dr. Crater Decl. ¶ 9). Georgia has reported over 104,486 cases among children between the ages of ten and fourteen, with 9,000 of those cases occurring between September 17 and September 27, 2021. (Crater Decl. ¶ 23). The case rate among K-12 aged children in Cobb County is more than twice as high as the U.S. Department of Health and Services' "dark red" zone classification, and 1050% higher than the fourteen-day case rate around the same time last year. (Schmidtke Decl. ¶ 10).

Pediatric hospitalizations have also recently risen significantly. (Crater Decl. ¶ 11). Of children who have been hospitalized with COVID-19 since March 2020, one in four has required intensive care. (Crater Decl. ¶ 13). Children with severe COVID-19 are at risk of developing respiratory failure, myocarditis, shock, acute renal failure coagulopathy, and organ failure. (Crater Decl. ¶ 33). COVID-19 is one of the leading causes of death for adolescents. (Crater Decl. ¶ 19).

The risks of COVID-19 infection in children are not limited to hospitalization or death. Even children who suffer mild COVID-19 infections are susceptible to severe post-infection complications, like Multisystem Inflammatory Syndrome in Children ("MIS-C") and "Long COVID." (Crater Decl. ¶¶ 42-44). MIS-C often requires intensive care and causes multiple inflamed organs, including the heart, lungs, kidneys, brain, eyes, or gastrointestinal organs. (Crater Decl. ¶ 42). Long

COVID symptoms, including chronically disabling fatigue, sleep disturbance, headache, difficulty concentrating, and sensory deficits, can last months after diagnosis. (Crater Decl. ¶ 44; McLaughlin Decl. ¶ 20).

<u>Heightened Risk to Plaintiffs</u>

COVID-19 presents particularly acute risks for children and young people with disabilities, including underlying medical conditions, that put them at risk of severe illness or death from contracting the virus. (Crater Decl. ¶ 24). Children with medical complexity, genetic, neurologic, or metabolic conditions, congenital heart disease, obesity, diabetes, asthma or chronic lung disease, sickle cell disease, cancer, chromosomal disorders, or immunosuppression can be at increased risk for severe illness from COVID-19. (Crater Decl. ¶¶ 24-26). Plaintiffs are among those children at increased risk of serious illness or death because of their disabilities. (Crater Decl. ¶¶ 7, 34-37).

Plaintiff L.E. is a thirteen-year-old child who was diagnosed with acute myeloid leukemia ("AML") when he was an infant. (Cavorley Decl. ¶¶ 2-3). His chemotherapy treatments have severely weakened his immune system, leading to a diagnosis of hypogammaglobulinemia. (Cavorley Decl. ¶¶ 3-5). Plaintiff B.B. is a fifteen-year-old child diagnosed with Duchenne Muscular Dystrophy ("DMD"), a terminal disease that causes muscle weakness, including in the heart and respiratory

muscles. (Baird Decl. ¶¶ 1, 2). His condition causes impaired pulmonary function, which can result in acute respiratory failure, and its degenerative nature also weakens his respiratory system. (Baird Decl. ¶¶ 4, 5). His treatment consists of steroids, which suppress and weaken his immune system. (Baird Decl. ¶ 5).

Plaintiff A.Z. is a seven-year-old child with chronic bronchitis, persistent asthma, recurrent pneumonias, and airway clearance impairment. Recently, she was diagnosed with bronchiectasis of the right middle lobe. (Zeigler Decl. ¶¶ 2-3). A.Z. experiences recurrent episodes of respiratory illnesses that require additional therapies and medications. (Zeigler Decl. ¶¶ 3-5). A.Z. is not yet eligible to be vaccinated and at increased risk. (Zeigler Decl. ¶ 18; Crater Decl. ¶ 24). Plaintiff C.S. is a fourteen-year-old child with severe asthma. (Shirley Decl. ¶¶ 3-4). His asthma predisposes him to recurrent episodes of respiratory illness and sinus infections, requiring frequent emergency room visits. (Shirley Decl. ¶¶ 3-4).

The District has identified all four Plaintiffs as students with disabilities. (Cavorley Decl. ¶ 5; Baird Decl. ¶ 20; Zeigler Decl. ¶ 11; Shirley Decl. ¶ 5).

<u>COVID-19 in Schools</u>

The risk of exposure to and transmission of COVID-19 is especially significant in schools, where many students are unvaccinated and proximate with one another for long periods of time. (Schmidtke Dec. ¶ 7; Huffman Decl. ¶ 17). The

Georgia Institute of Technology has developed a COVID-19 Event Risk Assessment Tool which indicates that the risk of COVID-19 exposure in Cobb County in a group of 25 people—like a classroom—is 41%, "just short of a coin toss." (Schmidtke Decl. ¶ 15; Crater Decl. ¶ 18). The exposure risk in a group of 100 people—like in a school cafeteria—is 88%, and in a group of 500 people—like at a school assembly—the risk is estimated to be over 99%. (Schmidtke Decl. ¶ 15).

The Centers for Disease Control and Prevention ("CDC") and American Academy of Pediatrics ("AAP") have released clear guidance for COVID-19 prevention in schools.[1] Local health agencies have endorsed and adopted these recommendations. The Georgia chapter of the AAP issued an open letter urging Georgia school districts to implement CDC guidance.[2] In August, hundreds of Cobb County medical professionals pleaded the District to implement CDC guidelines. (Verigan Decl. ¶ 5). On September 7, 2021, the Cobb County Board of Health ("CBOH") called an emergency meeting to discuss COVID-19 in Cobb County

---

[1] *Guidance for COVID-19 Prevention in K-12 Schools*, CENTERS FOR DISEASE CONTROL AND PREVENTION (last updated Aug. 5, 2021), https://bit.ly/3jZKeoV; *COVID-19 Guidance for Safe Schools*, AMERICAN ACADEMY OF PEDIATRICS, https://bit.ly/3zQwp15 (last visited Sept. 28, 2021).

[2] Letter from Hugo Scornik, President, Georgia Chapter of American Academy of Pediatrics (Jul. 20, 2021), available at: https://bit.ly/3AUztKL.

schools and adopt a position statement endorsing CDC and AAP guidelines, including universal masking.[3]

Public health experts recommend a multilayered approach to COVID-19 prevention, particularly in K-12 schools. (Schmidtke Decl. ¶ 7; Huffman Decl. ¶ 15). This approach includes vaccinations for eligible students, teachers, and staff, universal indoor mask use, some outdoor mask use, physical distancing, improved ventilation in school facilities, contact tracing procedures, symptom screening, surveillance testing, and quarantine for at least seven days for exposed students and staff. (Schmidtke Decl. ¶ 7; Huffman Decl. ¶ 15; McLaughlin Decl. ¶ 26). "There is overwhelming scientific evidence that masks work to decrease transmission of COVID-19." (Crater Decl. ¶ 51). Universal masking in schools is significantly more effective at reducing spread than partial masking. (Crater Decl. ¶¶ 54-55; Huffman Decl. ¶¶ 14-16).

<u>The District's Willful and Deliberate Refusal to Act</u>

The District knows the research-based, expert-endorsed guidance for mitigating COVID-19 risks in schools. Last year, it implemented safety protocols that complied with CDC guidelines, requiring masks indoors and on buses, physical

---

[3] Carol Holtz, Cobb County Board of Health, Position Request for Consideration (Sept. 7, 2021), *available at* https://bit.ly/3mdxXNE.

7

distancing, and mandatory, daily cleaning practices, without undue burden or interference with its day-to-day operations.[4] (Schmidtke Decl. ¶ 7; Cavorley Decl. ¶ 8). Indeed, the District argued vigorously *in favor of* universal indoor masking and other CDC guidelines before this Court when confronted with a lawsuit challenging the plan in April 2021.[5] The District emphasized the importance of mandatory masking for "the public's wellbeing."[6]

In June 2021, the District abandoned its CDC-compliant plan in favor of new 2021-2022 COVID-19 protocols ("21-22 Protocols") which are inconsistent with public health expert recommendations by not requiring masks in schools or on buses, physical distancing, frequent handwashing, improved ventilation, screen testing, adequate surveillance and contact tracing, or vaccination promotion among those who are eligible.[7] (Schmidtke Decl. ¶ 7).

The 21-22 Protocols have been ineffective in preventing infection. The District has reported 5,372 positive COVID-19 cases since school began August 2,

---

[4] Cobb County School District, Re-Opening Plan 2020-2021 School Year (2020), https://bit.ly/2Zzp4X0.

[5] Resp. in Opp. to Pltf's Mot. for Temporary Restraining Order, *W.S. v. Ragsdale*, No. 1:21-cv-01560-TWT (ECF No. 5), 2021 WL 2024687 (N.D. Ga. May 12, 2021).

[6] *Id*.

[7] Cobb County School District, 2021-2022 Public Health Protocols (2021), https://bit.ly/3zWEp0p.

2021, and several schools have had to quarantine entire grades.[8] (Crater Decl. ¶ 20). There have been at least 136 COVID-19 outbreaks between Cobb and Douglas County Schools since the beginning of this school year. (Crater Decl. ¶ 23).

Still, the District refuses to act, despite receiving more than $160 million in federal funds under the American Rescue Plan for the purpose of protecting students and opening schools safely.[9] On August 19, 2021, the same day that Cobb County Board of Commissioners declared a local emergency, Defendants Ragsdale, Scamihorn, Banks, Chastain, and Wheeler refused to allow COVID-19 safety protocols from even being discussed on the school Board's meeting agenda.[10]

<u>Risk and Harm to Plaintiffs</u>

Defendants' refusal to adopt—or even consider—effective COVID-19 safety protocols has denied Plaintiffs, because of their disabilities, the opportunity to attend school in-person safely. Plaintiffs are isolated at home, where they receive an

---

[8] *COVID Case Notification*, COBB SCHOOLS, https://bit.ly/3jZ59IY (last visited Sept. 28, 2021).
[9] Jahvarius Kendrick, *American Rescue Plan Gives Metro Atlanta Schools Over a Billion Dollars*, EDUCATION IN ATLANTA, https://bit.ly/3unbj97 (last visited Sept. 28, 2021).
[10] Cobb County School District, *Board of Education Work Session* (Aug. 19, 2021), https://www.cobbk12.org/page/8993/watch-meetings-online; Cobb County School District, *Board of Education Meeting*, (Aug. 19, 2021), https://www.cobbk12.org/page/8993/watch-meetings-online.

inadequate, unequal education or no education at all. (Cavorley Decl. ¶¶ 10-11, 13, 17; Baird Decl. ¶¶ 21, 24; Zeigler Decl. ¶¶ 20, 24-25; Shirley Decl. ¶¶ 14, 16).

Plaintiffs have requested modifications to Defendants' policies and practices to mitigate their health and safety risks and allow them meaningful access to an in-person education. (Cavorley Decl. ¶ 12, Baird Decl. ¶¶ 17-20; Zeigler Decl. ¶¶ 13-16; Shirley Decl. ¶¶ 12-14). However, their requests have been ignored or denied. (Cavorley Decl. ¶ 12; Baird Decl. ¶¶ 17-20, 22-24; Zeigler Decl. ¶¶ 13, 16; Shirley Decl. ¶¶ 12-13). If the District adopted CDC-recommended safety protocols, Plaintiffs could safely return to school in-person. (Cavorley Decl. ¶ 24, Baird Decl. ¶ 26; Zeigler Decl. ¶ 27; Shirley Decl. ¶ 18).

## STANDARD OF LAW

To obtain a preliminary injunction, Plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003) (citing *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). The standard

for a preliminary injunction and a temporary restraining order ("TRO") is the same. *Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995).

## ARGUMENT

### A. PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS

Plaintiffs are substantially likely to succeed on their claims that Defendants have discriminated against them in violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 provides that "no otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).

Discrimination claims under the ADA and Section 504 are governed by the same legal standards, and the two claims are generally analyzed together. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). Both statutes require Plaintiffs to show that (1) they are qualified individuals with a disability, (2) who have been

excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or otherwise discriminated against by such entity, and (3) the exclusion, denial of benefits, or discrimination was by reason of such disability. *Am. Ass'n of People with Disabilities v. Harris,* 647 F.3d 1093, 1101 (11th Cir. 2011) (citing *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)). To obtain injunctive relief, Plaintiffs need not show that Defendants engaged in intentional discrimination. *See Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (citing *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 348 (11th Cir. 2012)).

    1.  <u>Plaintiffs are qualified individuals with disabilities</u>

The ADA and Section 504 define "disability" as a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); 29 U.S.C. § 705(20)(B). Proving disability is not a high bar. *See* 29 C.F.R. § 1630.1(c)(4) ("[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability."). A "qualified" individual with a disability is a person with a disability who "meets the essential eligibility requirements for the receipt of services or the

participation in programs or activities provided by a public entity." 42 U.S.C. §12131(2).

All Plaintiffs have physical or mental impairments that substantially limit one or more major life activities and increase their risk of serious illness or death if they contract COVID-19. The District has independently found Plaintiffs to be qualified individuals with disabilities by finding each of them eligible for an IEP or Section 504 Plan in school. Additionally, all Plaintiffs are eligible and entitled to receive a free, public education as school-aged children living in Cobb County, Georgia. *See* Ga. Const. art. III, § I, para. I; *see also Goss v. Lopez*, 419 U.S. 565 (1975).

2. Plaintiffs have been excluded from participation in, denied the benefits of, or otherwise subjected to discrimination by a public entity

The ADA and Section 504 and their implementing regulations broadly prohibit discriminatory conduct and impose affirmative obligations on public entities to avoid discrimination. *See* 28 C.F.R. § 35.130; 34 C.F.R. § 104.4. The District is a "public entity" under the ADA and Section 504 because it is a "state or local government" or "any department, agency, or other instrumentality of a State or local government" and it receives federal funds. *See* 42 U.S.C. §§ 12131(1), 12132; 28 C.F.R. § 35.130; 29 U.S.C. § 794(b)(2)(B).

Defendants discriminate against Plaintiffs in four distinct ways, *any one of which suffices* as grounds for injunctive relief: (a) excluding Plaintiffs from and

13

denying them the benefits of an in-person public education and other school activities, in violation of 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a), (b)(1)(i); 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(a), (b)(1)(i), (b) failing to reasonably modify the District's programs to avoid discrimination on the basis of disability, in violation of 28 C.F.R. § 35.130(b)(7), (c) failing to educate Plaintiffs in the most integrated setting appropriate to their needs, in violation of 28 C.F.R. § 35.130(d) and 34 C.F.R. § 104.34(a), and (d) administering policies with the effect of subjecting Plaintiffs to discrimination on the basis of disability, in violation of 28 C.F.R. § 35.130(b)(3) and 34 C.F.R. § 104.4(b)(4).

**First**, Defendants exclude Plaintiffs from participation in and deny them the benefits of the District's education in-person – conduct which is plainly prohibited. *See* 42 U.S.C. §12132. Exclusion or denial of benefits to an otherwise qualified person with a disability need not be deliberate, direct, or express to constitute prohibited discrimination under the ADA and Section 504. *Belton v. Georgia*, No. 1:10-CV-0583-RWS, 2012 WL 1080304, at *9 (N.D. Ga., Mar. 30, 2012) ("The Act's implementing regulations make clear that [ ] exclusion or denial of benefits need not be express or direct to run afoul of the ADA."); *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach*, 954 F. Supp. 986 (S.D. Fla. 1995) (finding that plaintiffs who could not participate in city recreational programs due to

their disabilities and the nature of the offered activities were "excluded" in violation of the ADA, even without evidence of deliberate exclusion). And a qualified individual need not be entirely excluded or denied of a benefit to establish discrimination under the ADA. *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) ("[A] violation of Title II . . . does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity."); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1159-60 (N.D. Ala. 2020) ("[T]o establish an exclusion for purposes of Title II, the plaintiffs do not need to show that they are prohibited from [the service], but only that [the service] is not 'readily accessible' to them.").

Individuals with disabilities are also effectively excluded from or denied the benefits of a service when they have an unequal opportunity to participate in or realize the benefit of a public entity's service, or are otherwise limited in the enjoyment of a right, privilege, advantage, or opportunity enjoyed by others receiving the service – even when they are offered the exact same service offered to others. 28 C.F.R. § 35.130(b)(1)(ii)(vii); *see also Belton v. Georgia*, No. 1:10-CV-0583-RWS, 2012 WL 1080304, at *9 (N.D. Ga., Mar. 30, 2012) (citing 28 C.F.R. § 35.130(b)(1)(ii)-(iii)); *Tugg v. Towley*, 864 F. Supp. 1201, 1205-07 (S.D. Fla. 1994) (finding substantial likelihood of success on the merits of plaintiffs' ADA claims

where the state offered mental health counseling but failed to offer equal benefit to deaf and hard of hearing plaintiffs for American Sign Language-proficient counselors); *Concerned Parents*, 954 F. Supp. at 991 (holding that one size fits all recreational programs denied the benefits of recreation to individuals with disabilities who could not access the programs due to their limitations).

Plaintiffs have medical conditions due to their disabilities and are at increased risk of severe illness or death from COVID-19. Because Defendants have created an unreasonably dangerous learning environment, Plaintiffs must stay home and Defendants deny them an equal opportunity to participate in an in-person education and its benefits.

**Second,** Defendants discriminate against Plaintiffs by failing to reasonably modify the District's policies and practices to ensure Plaintiffs can access an in-person education. The ADA requires public entities to make "reasonable modifications in policies, practices, or procedures when modification is necessary to avoid discrimination on the basis of disability[.]" 34 C.F.R. § 35.130(b)(7). And the District's failure to comply with this obligation is a form of discrimination under both the ADA and Section 504. *See Alboniga v. Sch. Bd. of Broward Cnty. Fla.*, 87 F. Supp. 3d 1319, 1337 (S.D. Fla. 2015) (citing *Wisconsin Cmty. Servs. Inc. V. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006) (citations omitted)); *Nadler v.*

*Harvey*, No. 06-12692, 2007 WL 2404705, at \*5 (11th Cir. Aug. 24, 2007); *McGary v. City of Portland,* 386 F.3d 1259, 1266 (9th Cir. 2004) (holding that failure to make reasonable accommodations is sufficient to state ADA claim).

A modification, or accommodation, is necessary if a qualified individual with a disability is, because of their disability, unable to meaningfully access a benefit to which they are entitled, and the proposed modification will allow such meaningful access. *Alexander v. Choate*, 469 U.S. 287 (1985). It is reasonable if it seems reasonable "in the run of cases" and would not fundamentally alter the nature of the service or activity. *Shaw v. Habitat for Humanity of Citrus Cnty., Inc.*, 938 F.3d 1259, 1265 (11th Cir. 2019); *Bircoll*, 480 F.3d at 1082; *see also Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016).

"[T]he burden of establishing the reasonableness of an accommodation is 'not a heavy one'. . . ." *Lamone*, 813 F.3d at 507 (4th Cir. 2016) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2nd Cir. 2003)). "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Id*. at 507-08 (quoting *Borkowski v. Valley Cent. Sch. Dist*., 331 F.3d 261, 280 (2d Cir. 2003)); *see also People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1217 (N.D. Ala. 2020). Recently, two courts found that plaintiffs were substantially likely to show that a mandatory mask requirement is a

reasonable modification under Title II of the ADA. *See G.S. by and through Schwaigert v. Lee*, No. 21-cv-02552-SHL, 2021 WL 4057812, at *13 (W.D. Tenn. Sept. 17, 2021) ("The use of masks is overwhelmingly supported as a means of preventing COVID-19 transmission."); *Disability Rights South Carolina v. McMaster*, No. 3:21-02728-MGL, 2021 WL 4449446, at *19 (D.S.C. Sept. 28, 2021) ("No one can reasonably argue that it is an undue burden to wear a mask to accommodate a child with disabilities.").

Here, Plaintiffs lack any access – much less meaningful access – to an in-person education because of their disabilities. Plaintiffs have reasonably requested that the District accommodate them by modifying its operational practices to create a safe in-person learning experience. Plaintiffs' requests would not require the District to fundamentally alter its services because the District followed public health recommendations last year and has received an additional $160 million dollars in federal funds to improve safety measures since that time. Other school districts across Georgia and the United States, many of which have far fewer resources than the District, have demonstrated the ease and effectiveness of complying with CDC guidelines. And the District has argued for the implementation of such guidance as a *necessary* precaution before this Court in April. *See* Resp. in Opp. to Pltf's Mot. for Temporary Restraining Order, *W.S. v. Ragsdale*, No. 1:21-

cv-01560-TWT (ECF No. 5), 2021 WL 2024687 (N.D. Ga. May 12, 2021). The District's refusal to reasonably accommodate Plaintiffs is actionable discrimination.

**Third,** Defendants discriminate against Plaintiffs by failing to educate them in the most integrated environment appropriate to their needs in violation of 28 C.F.R. § 35.130(d). The unnecessary segregation of persons with disabilities constitutes *per se* discrimination on the basis of disability and gives rise to liability under the ADA and Section 504. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597-98 (1999); *Georgia Advocacy Office v. Georgia*, 447 F. Supp. 3d 1311, 1321-22 (N.D. Ga. 2020) (upholding *Olmstead* as applied to the unnecessary segregation of students with disabilities in public schools). Segregation is "unnecessary" where persons are eligible to receive services in a more integrated setting. *Olmstead*, 527 U.S. at 600. Defendants' refusal to implement effective COVID-19 safety protocols has barred Plaintiffs from in-person school and forced them into an isolated, segregated educational environment despite their eligibility and desire for more integrated services.

**Finally**, Defendants discriminate against Plaintiffs by administering policies that have the effect of subjecting plaintiffs to discrimination. Liability does not hinge on whether Defendants make intentional or deliberate decisions causing the discrimination of persons with disabilities. The District is also prohibited from

utilizing "methods of administration" with the same *effect*. 28 C.F.R. § 35.130(b)(3); 34 C.F.R. § 104.4 (b)(4) (emphasis added). Courts have found this provision to apply "to both written policies as well as actual practices, and [that it] is intended to prohibit both 'blatantly exclusionary policies or practices' as well as 'policies and practices that are neutral on their face but deny individuals with disabilities an effective opportunity to participate.'" *Schwarz v. The Villages Charter Sch., Inc.*, 165 F. Supp. 3d 1153, 1181 (M.D. Fla. 2016), *aff'd sub nom. Schwarz v. Bd. of Supervisors on behalf of Villages Cmty. Dev. Districts*, 672 F. App'x 981 (11th Cir. 2017) (quoting *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980 (N.D. Ca. 2010)).

Defendants' operational policies and practices offer students the option of wearing masks and fail to require social distancing, effective quarantine procedures, improved ventilation, or other CDC-recommended safety protocols. Defendants' administration of these policies and practices has the effect of subjecting Plaintiffs to discrimination because the District excludes Plaintiffs from in-person services and segregates them at home.

3. Plaintiffs have been discriminated against on the basis of their disabilities

Section 504 requires that a plaintiff show that the challenged discrimination occurred "solely by reason of [plaintiff's] disability." 29 U.S.C. § 794(a). However, under the ADA, the disability need not be the sole cause of the challenged

discrimination to give rise to a violation. *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1999). The ADA imposes a "but for" liability standard, requiring only that Plaintiffs show a causal connection between their disability and the challenged conduct. *Id*. at 1076-77; *see also Bircoll*, 480 F.3d at 1081 n.11; *Schwarz*, 544 F.3d at 1212 n.6; *People First*, 491 F. Supp. 3d at 1179 (holding that plaintiffs demonstrated the requisite causal connection under the ADA when they showed a causal link between their disabilities, the conditions making them vulnerable to COVID-19, and their exclusion from in-person voting).

When a public entity fails to comply with its affirmative obligations to accommodate or integrate, the discrimination is on the basis of disability *per se* and the causation distinctions between the ADA and Section 504 are immaterial. *Olmstead*, 527 U.S. at 597 (holding that unjustified institutionalization is *per se* discrimination on the basis of disability); *Bennett–Nelson v. La. Bd. of Regents,* 431 F.3d 448, 454 (5th Cir.2005) ("[N]o question that the failure to provide accommodations [was] the sole cause of the alleged denial of benefits to the plaintiffs" and "if the accommodation is required the defendants are liable by simply not providing it.").

Under either standard, Plaintiffs can successfully show that they have been discriminated against by reason of their disabilities. Plaintiffs would be attending

school in-person if Defendants complied with public health expert guidance and recommendations. Defendants' failure to protect Plaintiffs because of their medical conditions is the direct cause of their exclusion from in-person school.

## B. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

Plaintiffs will also suffer irreparable harm in the absence of an immediate injunction requiring Defendants to implement CDC guidelines to safely allow Plaintiffs' access to an in-person education. Harm exists if a possible injury is both "actual and imminent," and harm is irreparable if it "cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citing *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989)).

Defendants' discriminatory conduct causes irreparable harm because it violates federal civil rights and disability laws. Courts "presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation." *See Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir. 1984) ("[I]rreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes."); *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) (citations omitted); *Duke v. Uniroyal, Inc.*, 777 F. Supp. 428, 433 (E.D.N.C. 1991) ("The purpose of the presumption of irreparable

injury in civil rights cases is to afford plaintiffs relief in areas where injury is difficult to establish.").

Plaintiffs also suffer continuing irreparable harm because they are being denied educational opportunities and the social, emotional, and academic benefits that neither damages nor success on the merits can compensate. *See Hispanic Interest Coalition v. Governor of Ala.,* 691 F.3d 1236, 1249 (11th Cir. 2012) (holding that interference with educational rights is not harm that can be compensated by money damages "given the important role of education in our society and the injuries that would arise from deterring [ ] children from seeking the benefit of education"); *see also Alejandro v. Palm Beach State Coll.*, 843 F. Supp. 2d 1264, 1270-71 (S.D. Fla. 2011) (holding that missing classes constitutes irreparable harm and granting injunctive relief); *Ray v. Sch. Dist.*, 666 F. Supp. 1524, 1535 (M.D. Fla. 1987) (finding irreparable injury where HIV-positive students were unnecessarily excluded from a "normal, integrated classroom setting"); *Borough of Palmyra, Bd. of Educ. v. F.C. ex rel. R.C.,* 2 F. Supp. 2d 637, 645 (D.N.J. 1998) (finding loss of an appropriate education to be an irreparable harm under preliminary injunction analysis). And students with disabilities experience exacerbated harm when they miss educational opportunities. *L.R. v. Steelton-Highspire Sch. Dist.*, No. 1:10CV00468, 2010 U.S. Dist. LEXIS 34254, at *11 (M.D. Pa. Aug. 7, 2010)

("Although this would trouble the court under ordinary circumstances, it is even more troubling because [the child] is a student with a disability whose needs were met in [the school district] over a period of years.").

### C. THE THREATENED HARM TO PLAINTIFFS OUTWEIGHS ANY POTENTIAL DAMAGE TO DEFENDANTS, AND AN INJUNCTION WOULD NOT HARM THE PUBLIC INTEREST

The equities weigh heavily in favor of granting Plaintiffs' TRO and preliminary injunction. "Education is perhaps the most important function of state and local governments," because "it is doubtful that any child may be reasonably expected to succeed in life if he is denied the opportunity of an education." *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954). Education is of such critical importance that when a policy deters children from attending school, the equities favor enjoining the policy. *Hispanic Interest Coal. v. Governor of Ala.*, 691 F.3d 1236, 1249 (11th Cir. 2012). Protecting children against disability discrimination is a matter of equal importance. The Congressional intent for enacting the ADA was to "provide a clear and comprehensive national mandate for the elimination of discriminating against individuals with disabilities," recognizing disability discrimination as a "serious and pervasive social problem." 42 U.S.C. § 12101.

Granting a TRO and preliminary injunction is necessary to protect Plaintiffs' interests in avoiding discrimination and participation in their education. Conversely,

Defendants have the resources and experience to implement CDC guidelines and will not be harmed by doing so to ensure that Plaintiffs can safely attend school in-person. A TRO and preliminary injunction would not harm the public interest, but rather serve the public's interest in good health and safety.

## CONCLUSION

Plaintiffs have adequately shown the necessity for a TRO and preliminary injunction, and respectfully request that this Court enjoin Defendants from causing further irreparable harm. The undersigned counsel hereby certifies that this brief complies with L.R. 5.1B and 7.1 and that this brief is published in 14-point Times New Roman font.

Dated: October 1, 2021.

Respectfully submitted,

**SOUTHERN POVERTY LAW CENTER**

/s/ *Michael J. Tafelski*
Michael J. Tafelski
Ga. Bar No. 507007
Eugene Choi
Ga. Bar No. 121626
Claire Sherburne
Ga. Bar No. 732244
Brock Boone (*pro hac vice* forthcoming)
Ala. Bar No. 2864-L11E
P.O. Box 1287
Decatur, GA 30031-1287
(334) 956-8273

michael.tafelski@splcenter.org
eugene.choi@splcenter.org
claire.sherburne@splcenter.org
brock.boone@splcenter.org

**LAW OFFICE OF ALLISON B. VROLIJK**

/s/ *Allison B. Vrolijk*
Allison B. Vrolijk
Ga. Bar No. 299360
885 Woodstock Road, Suite 430-318
Roswell, GA 30075
(770) 587-9228
allison@vrolijklaw.com

**GOODMARK LAW FIRM**

/s/ *Craig Goodmark*
Craig Goodmark
Ga. Bar No. 301428
1425 Dutch Valley Place, Suite A
Atlanta, GA 30324
(404) 719-4848
cgoodmark@gmail.com

**ATTORNEYS FOR PLAINTIFFS**