IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| L.E., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CHRIS RAGSDALE, et al.,<br><br>Defendants. | Civil Action No. 1:21-cv-04076-TCB |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TRO AND
<u>PRELIMINARY INJUNCTION</u>**

Defendants[1] file this Response in Opposition to Plaintiffs' Motion for a
Temporary Restraining Order and/or Preliminary Injunction [Doc. 2-1].

## I.   <u>INTRODUCTION</u>

This Court should reject Plaintiffs' invitation to weigh in on matters of local
politics by second-guessing the wisdom of CCSD's COVID-19 mask policy.
Georgia law defers to local school districts in "develop[ing] policies, regulations, and

---

[1] In addition to Cobb County School District ("CCSD" or "District"), Plaintiffs have
sued Superintendent Chris Ragsdale and all members of the Cobb County Board of
Education in their official capacities. Claims against government officials in their
official capacities are in reality claims against the government entity they serve. *City
of Atlanta v. Mitcham*, 296 Ga. 576, 583 (2015); *Everson v. DeKalb Cnty. Sch. Dist.*,
344 Ga. App. 665, 666 (2018).

procedures related to the impact of infectious diseases on school system management and operations." Ga. Comp. R. & Regs. § 160-1-3-.03(2)(a). Though reasonable minds might disagree over whether schools should mandate masks, school districts have exclusive domain over these operational decisions. CCSD has made its safety decisions based on verified public health data, scientific guidance, and consideration of the needs of all students. It has chosen what it believes is right for Cobb County. Plaintiffs' request for a TRO and preliminary injunction is just the latest attempt by one side of the political debate to usurp a school district's operational autonomy over COVID-19 policy.

Under Federal Rule of Civil Procedure 65, Plaintiffs have a high burden to demonstrate entitlement to such extraordinary and dramatic relief. Plaintiffs miss the mark completely. They cannot demonstrate a substantial likelihood of prevailing on their disability discrimination claims because the challenged mask policy does not treat them any differently than their non-disabled peers, and CCSD has reasonably accommodated their disabilities with its numerous other pandemic safety measures, robust virtual offerings and individualized supports. They cannot show irreparable harm because they are simply complaining about not receiving their *preferred* educational services—not a deprivation of access to education altogether. And their requested relief would unduly burden District-wide operations and disserve the

public interest by trying to address individualized disability issues with a one-size-fits-all approach.

Given how politically charged mask policies have become, it is impossible for a school district to please everyone. When CCSD mandated masks, it was sued. And when it made masks optional, Plaintiffs sued. Fortunately for this Court, it need not referee these types of disputes, because, regardless of whether CCSD requires masks, that decision is CCSD's alone to make. The majority of courts that have heard legal challenges to school mask policies have deferred to school district discretion on how best to protect the health and safety of students and employees.[2] This Court should do the same here.

## II.   STATEMENT OF FACTS

### A.   Plaintiffs' claims and the injunctive relief sought

Plaintiffs filed their Complaint on behalf of four minor children, L.E., B.B, A.Z., and C.S. [Doc. 1 ¶¶ 18-21.] Notably, because Plaintiffs have not brought this as a class action, the only students at issue in this Complaint are the four named

---

[2] *See, e.g.*, *Hayes v. DeSantis*, No. 1:21-CV-22863-KMM, 2021 WL 4236698 (2021) (denying TRO motion requesting court-ordered mask mandate in schools); *Disability Rts. S.C. v. McMaster*, No. CIV 3:21-02728-MGL, 2021 WL 4444841, *11 (D. S.C. Sept. 28, 2021) ("allowing school districts, at their discretion" to decide appropriate mask policy); *ARC of Iowa v. Reynolds*, No. 4:21-CV-00264, 2021 WL 4166728, at *12 (S.D. Iowa Sept. 13, 2021) (same).

Plaintiffs. Thus, the only issue before this Court is the impact the District's mask policy has on these four individuals alone.

Plaintiffs allege the District violated their rights under Title II of the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act of 1973 when it implemented a mask-optional policy for the 2021-2022 school year and did not follow all CDC guidelines. [*Id.* at ¶¶ 1, 30, 38.] Plaintiffs ask this Court to "Order Defendants to develop and implement policies, practices, procedures, and protocols for a multilayered COVID-19 mitigation strategy that follows existing CDC guidelines for COVID-19 Prevention in K-12 Schools…and to maintain consistency with CDC guidelines in the event of subsequent changes." [Doc. 1 at 45-46.]

## B. CCSD's District-wide COVID-19 mitigation measures

The District has developed robust COVID-19 response and intervention strategies based on guidance from public health agencies. (See Floresta Decl. ¶ 5 attached here to as Exhibit 1.) The District currently implements most of the recommendations listed in CDC Guidance. A non-exhaustive sampling of the District's current safety measures includes: strongly recommending masks and making them available for those who do not have one; strict disinfection procedures; replacing over 27,000 air filters regularly and using ionization devices to clean air

in ventilation systems; enhanced daily cleaning procedures; contact tracing in combination with quarantine and isolation; vaccination events for staff; vaccination education for students and families;[3] protective partitions in select locations; physical distancing where possible including signs and guides to promote same; hand sanitizing stations; encouraging staff and students to stay home when sick and get tested; protocols for responding to staff or students that show symptoms; promotion of handwashing and respiratory etiquette; social, emotional and mental health support; education, dissemination, and reinforcement of safety measures; in addition to a long list of other efforts. (*Id*. ¶ 16-32.) A complete description of the District's current COVID-19 safety measures is included in the declaration of John Floresta and the District's 2021-2022 Reopening Plan. (Floresta, Decl. at Ex. 1-B.)

**C. GDPH and District data supports the District's decisions.**

The District uses data-driven decision making to guide its multi-layered approach of prevention strategies, as recommended by the CDC and GDPH. (Floresta, Decl. ¶¶ 29-31, 34, 53.) The data the District relies upon is collected by

---

[3] Plaintiffs acknowledge that "Vaccines against COVID-19 are now available and are both highly efficacious and effective against infection and symptoms." [Doc. 1 ¶ 32.] Despite three of the four Plaintiffs being age-eligible to receive the COVID-19 vaccine, only one has been fully vaccinated. (Coleman Decl. ¶ 5.)

the GDPH and distributed weekly in the School Surveillance Reports.[4] (*Id*. ¶ ¶ 34-37.) The GDPH School Surveillance Reports are the most reliable source of data available to Georgia school districts on the prevalence and transmission of COVID-19 for school-aged children ages 5-17. (*Id*. ¶ 36.)[5]

While Plaintiffs argue that the District's 2021-2022 Reopening Plan has been ineffective to date, the GDPH and District data indicate that throughout the pandemic, the total incidence rate of infection in all District schools has oscillated between 0 and 1% regardless of masking requirements. (*Id*. ¶ 44.) The District's current incidence rate is 0.2%, the lowest it has been since school began in August. (*Id*. ¶ 42.) The District's most recent data, released on October 8, 2021, shows a 73% drop in incidence rate for school-aged children in Cobb County from the peak this school year (*Id*. ¶ 40) and a 78% decrease in District-reported cases since the peak

---

[4] The GDPH publishes the School Surveillance Reports on its website, generally on Fridays, which are available at: https://dph.georgia.gov/school-aged-covid-19-surveillance-data.

[5] Notably, the information contained in the Cobb County numbers is inclusive of not only 5-17 year-olds enrolled in the CCSD, but also all 5-17 year-olds located within Cobb County, including those who attend Marietta City Schools, independent schools, home schools, and those who do not attend school at all. (*Id*. ¶ 35.) That means the 14-day-case-rates per 100,000 included in District's data are often higher than the cases that occurred among District students, but it is still the best measure the District has for monitoring the rate of infection among school-aged children located in Cobb County. (*Id*. ¶ 36.)

this school year. (*Id.* ¶ 43.) Put simply, COVID-19 incidence rates are currently on a downward trend and the best they have been in a long time.

In fact, Cobb County school-aged children had lower rates of infection than two of its mask-mandated neighboring counties during the September peak, and it often had the same or lower rates of infection than the five neighboring mask-mandated counties since the start of the 2021-2022 school year. (*Id.* ¶ 41.) Cobb County's school-aged infection rate has been equal to or below the state-wide rate through this entire school year. (*Id.*)

For Cobb County, local data simply does not support the conclusion that masks have made an appreciable difference in CCSD schools. (*Id.*) Whether this is true for all districts across the state or country is irrelevant, the District does not need to look to other patterns of community transmission to guide its local decision making.

The District's position is supported by Dr. Jay Bhattacharya, MD, PhD, and Professor of Health Policy at Stanford University School of Medicine. (See attached Dr. Jay Bhattacharya's Declaration, attached hereto as Exhibit 4.)  Dr. Bhattacharya has published over 154 scholarly articles in peer-reviewed journals in the fields of medicine, economics, health policy, epidemiology, statistics, law, and public health among others. To date, he has published six peer-reviewed publications on COVID,

including some of the most highly cited pieces during the pandemic. (Bhattacharya Decl. ¶¶ 3, 6, Ex. 4-A.) Dr. Bhattacharya's research concludes "there are no high-quality randomized evaluations that establish that masks on children are particularly effective in slowing disease spread." (*Id.* at Ex. 4-A, Pg. 3.) Rather, "[t]he highest quality observational evidence from the U.S. suggests no correlation between mandating that children wear masks and disease outcomes." (*Id.*)

"The effectiveness of masks differ based on the type of mask (cloth vs. surgical vs. N95), protocols for replacing contaminated masks, how well trained the mask-wearer is in maintaining good mask fit, and a large number of other factors, including other non-pharmaceutical interventions such as hand washing, social distancing, and ventilation upgrades." (*Id.*, Pg. 26.) "The best guide to the effectiveness of masks – the highest quality evidence – are randomized controlled trials that reduce bias from many sources on the effectiveness estimates." (*Id.*) There is to date only a single peer-reviewed randomized study published on the effectiveness of masks in self-protection against COVID-19. The study, which did not enroll children, found no statistically significant difference between the treatment group and control group regarding the probability of infection." (*Id.* citing study.)

After summarizing and citing numerous research studies, Dr. Bhattacharya concludes that "[t]he overwhelming bulk of scientific studies that have examined the topic – including the best studies, which take pains to distinguish correlation from causation – find that children play a limited role in spreading COVID-19 infection to adults. It is striking that this conclusion holds even in situations where children were not required to wear masks." (*Id*., Pg. 25.)

Even the study cited by Plaintiffs comparing school masking policies in two Arizona counties is flawed. "Besides the obvious problem with the study – that it does not adopt a randomized design and should thus not be interpreted as providing causal evidence of the efficacy of mask mandates – there is another important problem with it. The study presents data on "outbreaks" rather than cases, hospitalizations or deaths among children or staff members. An outbreak is defined by two or more COVID cases at a school within a 14 day period. From the data presented in the paper, it is not possible to rule out the possibility that schools with mask mandates actually had more cases than schools without mask mandates." (*Id*., Pg. 32.)

Many of Plaintiffs' other claims are not supported by the GDPH School Surveillance Data Reports. Plaintiffs attempt to scare this Court into action by asserting there have been more than 1,150 COVID-19 deaths in Cobb County. [Doc.

1 ¶ 31.] However, the GDPH has reported no school-aged (5-17) deaths in Cobb County since the start of the pandemic. (Floresta Decl. ¶ 46.) Cobb County school-aged children have made up only 2% of COVID-19 hospitalizations. (*Id*.) Further, "[t]he CDC estimates that compared to adults 40 to 49 years of age, children 5 to 17 years of age have 160 times lower risk of death from COVID-19 and 27 times lower risk of hospitalization from COVID-19." (Bhattacharya Decl. at Ex. 4-B Pg. 13.) The District has provided credible expert testimony based on respected scientific research that severe health complications, long-lasting symptoms, and MIS-C are all rare among children. (*Id*. at Ex. 4-B Pg. 19.) Though cases did increase from the Delta variant across the state of Georgia during the month of August, those numbers are now steadily decreasing in Cobb County, and have been since the September 2nd GDPH Report. (*Id*. ¶41.) The current 14-day-case rate in Cobb County is 390/100,000 or 3.9/1,000, which is significantly lower than the numbers Plaintiffs cite to from the peak in early-to-mid September. (*Id.*)

While the current 14-day-case rate in Cobb County is 390/100,000 as of October 8, 2021 as opposed to 35/100,000 in October 8, 2020, the scenarios are not comparable. In fall of 2020, most workplaces were still remote, and schools were only just beginning to phase in face-to-face learning. The case count would naturally be much lower in those circumstances. Many of the state-wide measures enacted

during the beginning months of the pandemic that were in place then have since been lifted also, making Plaintiffs' attempt to pin the difference in Cobb County's numbers from then to now as resulting from the lack of a universal mask mandate a misleading and inapposite conclusion.

To illustrate this point further, according to GDPH, the peak of the pandemic occurred in January 2021 for Cobb County, with a 7-day moving average of 734 total COVID-19 cases reported. During that time, the District was under a universal indoor masking mandate. Conversely, the 7-day moving average in September of 2021 (including this school year's peak) never exceeded 500 total cases, while the District has been mask optional. As of October 8, 2021, the District is currently at a 7-day moving average of 143 total cases reported, without a mask mandate. (*Id*. ¶ 45.) Thus, at it stands now, the District's 7-day moving average is 81% lower than it was when it had a mask mandate during last school year's peak.

There is also little evidence to indicate that a District-wide mask mandate will enable these individual Plaintiffs to attend in-person school. During the 2020-2021 school year, when the District had a mask-mandate in place, none of the Plaintiffs attended school in-person. (Coleman Decl. ¶¶ 7, 12, 22, 32, 42.) Unfortunately, significantly immunocompromised and medically fragile children have always faced

an increased risk from communicable viruses such as influenza,[6] pneumonia, RSV, etc. Thus, to adopt Plaintiffs' logic would be setting the stage for year-round mask-wearing in school, long beyond the end of the current pandemic.

To exemplify this point, one of the Plaintiffs has received Hospital Homebound (HHB) services for at least some portion of the last eight school years. (*Id*.) The HHB program is designed to provide home-based services for students who are too medically fragile to attend school. (*Id*. ¶ 21.) This Plaintiff could not consistently attend in-person school long before the COVID-19 pandemic. Requiring over 125,000 other staff and students to wear a mask so these four Plaintiffs can attend in-person school is non-sensical, especially when they were unable or unwilling to attend in-person when a mask-mandate was in place.

**D. Consequences of implementing a mask-mandate**

To be clear, Plaintiffs' requested relief is not without consequence. Plaintiffs are not just seeking a District-wide mask-mandate; they are also asking this Court to order that the District comply with all of the CDC's guidelines for mitigating COVID-19 in schools.[7] Because some of these guidelines are operationally

---

[6] "For most of the population, including the vast majority of children and young adults, COVID-19 infection poses less of a mortality risk than seasonal influenza." (Bhattacharya Decl. at Ex. 4-B Pg. 8.)

[7] It should be noted the CDC currently recommends that all age-eligible individuals be vaccinated. If this Court orders the District to follow every single CDC

impossible, the District will be unable to continue providing in-person instruction if Plaintiffs get their requested relief.  (Floresta Decl. ¶ 52.)

With respect to masks, the District received over 50,000 emails, letters, phone calls, meetings, and in-person protests by parents and community members objecting to its prior mask requirement. (*Id*. ¶ 47.) It received numerous complaints from parents and students with disabilities that its prior mask-mandate prevented some students with disabilities from attending in-person school because they could not wear a mask to school all day without harmful side effects. (*Id*. ¶ 48.) These families' concerns are supported by Dr. Bhattacharya. As one example of harm (he lists many), he cites research that supports that "Covering the lower half of the face of both teacher and pupil reduces the ability to communicate." (Bhattacharya, Decl. at Ex. 4-B Pg. 36.) He further concludes, "children lose the experience of mimicking expressions, an essential tool of nonverbal communication.  Positive emotions such as laughing and smiling become less recognizable, and negative emotions get amplified. Bonding between teachers and students is significantly and negatively affected. Masking exacerbates the chances that a child will experience anxiety and depression, which are already at pandemic levels themselves." (*Id*. Pg. 36-37.)

---

guideline—depriving the District of any discretion in crafting its COVID-19 policy—there will surely be parents who ask for a court-ordered vaccine mandate as well. And then there will be parents who challenge the legality of that mandate.

Many families have also implored the District not to reimpose a mask mandate because their students with disabilities would not be able to continue attending in-person instruction if the District did so. Thus, if the District must reinstate its mask mandate, it has a good faith reason to believe that some students with disabilities currently attending in-person school will no longer be able to do so. (*Id.* ¶ 48.)

The community is deeply divided over whether to require masks in schools. While the District always welcomes input and feedback from the community, it received approximately 39,000 emails from the community regarding a mask mandate or mask requirement. This volume of complaints caused administrators to divert their time and attention from other functions to respond to these parental concerns. (*Id.* ¶¶ 50-51.) The District has also had to defend litigation over its prior mask mandate. And while it was successful, it cost the District significant time and expense. The District has received additional threats of suit if it reinstates a mask mandate. (*Id.* ¶ 49.)

The burden of implementing a mask mandate in Cobb County currently outweighs its benefits. This is especially true given that the District has provided the Plaintiffs with full access to its educational programs and benefits.

**E. The District has reasonably accommodated the Plaintiffs.**

All Plaintiffs are performing well in school, meeting grade level standards and mostly earning As and Bs. (Coleman Decl. ¶¶ 14, 27, 37, 49.) They all "have received appropriate accommodations to enable them to access their education." (*Id.* ¶ 50.) "Two of the named Plaintiffs have Section 504 plans and two have Individual Education Plans (IEPs)." (*Id.* ¶ 4.) "The Plaintiffs' 504 and IEP teams have met to make determinations on the unique needs of each student and the required supports, services, and accommodations that each individual student may require to access their education. These are individualized decisions and none of the Plaintiffs have the same circumstances or needs." (*Id.* ¶ 8.)[8]

"To provide flexibility and meet the needs of students no matter their individual circumstances, the Cobb County School District expanded and developed several part-time and full-time virtual learning options during the 2021-2022 school year. These online learning options include full-time elementary, middle, and high options as well as part-time middle and high options." (Fuller Decl. ¶ 5.) "All of the Plaintiffs are eligible to receive full educational services via a virtual learning program offered by the Cobb County School District." (Coleman Decl. ¶ 6.)

---

[8] A description for each is set forth in Jessica Coleman's declaration attached as Exhibit 2.

However, only one of the Plaintiffs has chosen to participate. (*Id*.) That Plaintiff is currently earning all As and taking advanced honors classes.  (*Id*. ¶¶ 13, 14.)

"The District's virtual programming provides curriculum designed to meet national, state and District standards." (Fuller Decl. ¶ 17.) The various District options align to the Georgia Standards of Excellence, the International Standards for Technology Education (ISTE), and the National Standards of Quality Online Learning. (*Id*. ¶ 21.) "Classes are led by highly qualified teachers specifically trained in the delivery of online courses." (*Id*. ¶ 17.)

"Over 84% of the students enrolled in the District's virtual programs are non-disabled students." (*Id*. ¶ 16.) Thus, a virtual option does not segregate Plaintiffs from their non-disabled peers.  "Students with IEPs or Section 504 plans receive the services and supports in those plans that are appropriate to a virtual environment." (*Id*. ¶ 23.) The District's virtual options allow robust opportunities to interact with fellow students and teachers, much the same way they would in a physical classroom. (*Id*. ¶ 20.) Additionally, virtual students have access to a variety of academic supports. (*Id*. ¶ 19.)[9]

---

[9] A description of each of the District's virtual options is set forth in Ryan Fuller's declaration, attached as Exhibit 3.

### III.   ARGUMENT AND CITATION OF AUTHORITIES

This Court should deny Plaintiffs' Motion because they have not carried their burden of demonstrating entitlement to a TRO or preliminary injunction. Under Rule 65, a movant must prove four factors to justify temporary or preliminary injunctive relief: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable harm to the plaintiff, absent an injunction; (3) the threatened injury outweighs harm to the defendant; and (4) an injunction would serve the public interest. *Callahan v. U.S. Dep't of Health & Human Servs.*, 939 F.3d 1251, 1257 (11th Cir. 2019). Because preliminary or temporary injunctive relief is "an extraordinary and drastic remedy," the district court may not grant it unless the movant "clearly establishes" each of these prerequisites. *Id.* "Failure to show any of the four factors is fatal..." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Plaintiffs fail to satisfy any of the four.

They are unlikely to prevail on their ADA/504 claims because the challenged policy is non-discriminatory, and CCSD has reasonably accommodated their disabilities. They cannot show irreparable harm because they complain only that they have not received the educational services they prefer. And Plaintiffs' requested relief would substantially harm CCSD and disserve the public interest.

### A. Plaintiffs have not shown a substantial likelihood of prevailing on the merits of their ADA/504 claim.

When plaintiffs seek temporary or preliminary injunctive relief, the most common shortcoming is not showing a substantial likelihood of prevailing on the merits. *ACLU of Fla.*, 557 F.3d at 1198. If a plaintiff fails to do so, the court need not consider the remaining factors. *Callahan*, 939 F.3d at 1265 n.13; *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1329 (11th Cir. 2015). Plaintiffs have not demonstrated a substantial likelihood of prevailing on their ADA/504 claims.

Title II and Section 504 both prohibit disability discrimination in public services. *U.S. v. Fla.*, 938 F.3d 1221, 1228 (11th Cir. 2019). Courts therefore apply the same legal standards when analyzing claims under those statutes. *J.S., III by and through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). To prevail on a disability discrimination claim, the plaintiff must prove that: (1) "he is a qualified individual with a disability;" (2) "he was either excluded from participation in or denied the benefits of a public entity's service, programs, or activities," or the public entity "otherwise discriminated against" him; and (3) "the exclusion, denial of benefit, or discrimination" was because of his disability. *J.S., III by and through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017). A plaintiff may proceed under theories of disparate treatment or failure to

make a reasonable accommodation. *Schwarz v. City of Treasure Island*, 544 F. 3d 1201, 1212 n.6 (11th Cir. 2008).

Plaintiffs cannot prove either theory. They cannot show disparate treatment because the challenged policy is facially neutral and applies to all CCSD students, regardless of disability status. Plaintiffs' accommodation theory fails because CCSD has reasonably accommodated their disabilities, and their request for a mask mandate is unreasonable. Furthermore, Plaintiffs' claims are barred because they failed to exhaust their administrative remedies before filing suit.

### i. Plaintiffs cannot show disparate treatment.

Plaintiffs cannot show disparate treatment, because CCSD's mask-optional policy applies to all students, regardless of whether they have disabilities. Title II and Section 504 only require "evenhanded treatment and the opportunity for [disabled] individuals to participate in and benefit from programs receiving federal assistance." *Medina v. City of Cape Coral, Fla.*, 72 F. Supp. 3d 1274, 1279 (M.D. Fla. 2014). They do not guarantee persons with disabilities "equal results." *Id.* Thus, to show disparate treatment in the education context, it is not enough merely to show that the school district denied the student a free appropriate public education as required under special education laws. *J.S.*, 877 F.3d at 985. Rather, the plaintiff must prove he "was treated differently or excluded from something that other

students received." *Id.*; *see Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1222 (11th Cir. 2019) ("[D]iscrimination consists of treating *like* cases differently.").

Accordingly, a disabled student cannot show disparate treatment based on a school district's facially neutral COVID-19 policy that applies to both disabled and non-disabled students. *See*, *e.g.*, *Borishkevich v. Springfield Pub. Schs. Bd. of Educ.*, ___ F. Supp. 3d ___, 2021 WL 2213237, *7 (W.D. Mo. 2021). For instance, in *Borishkevich v. Springfield Public Schools Board of Education*, a group of disabled students claimed that a school district's COVID-19 re-entry plan, which provided both in-person and virtual learning options for all students, discriminated against them because of their disabilities. 2021 WL 2213237 at *2. The district court rejected that theory, reasoning that the challenged re-entry plan applied equally to all students, regardless of disability status. *Id.* at *7. The plaintiffs, like their non-disabled peers, "had the option to attend classes in-person part-time, or only attend classes virtually." *Id.* There was therefore no disparate treatment. *Id.*

Plaintiffs' theory of disparate treatment is similarly infirm. They make a conclusory allegation of disparate treatment, yet their own factual allegations show otherwise. CCSD's COVID-19 policies, including its mask-optional policy, apply to all students, regardless of whether they have disabilities. Like their non-disabled peers, Plaintiffs have the option of attending class in person or virtually. Attending

classes virtually would not segregate Plaintiffs, as 84% of CCSD's virtual students are non-disabled. (Fuller Decl. ¶ 16.) And Plaintiffs have the same opportunities to take advantage of in-person instruction as any other CCSD student. Accordingly, Plaintiffs cannot prove their disparate treatment theory.

### ii.   Plaintiffs cannot prevail on their failure-to-accommodate claim.

To prevail on a failure-to-accommodate claim, a plaintiff must prove three elements: "(1) she is a qualified individual with a disability; (2) she is unable, because of her disability to meaningfully access a public benefit to which she is entitled; and (3) the public entity failed, despite her request, to provide a reasonable accommodation for her disability." *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1328 (N.D. Ga. 2017). Under both Title II and Section 504, the reasonable accommodation requirements "are materially identical." *Alboniga v. Sch. Bd. of Broward Cnty., Fla.*, 87 F. Supp. 3d 1319, 1332 (S.D. Fla. 2015). School districts need provide "only those accommodations that are necessary to ameliorate a disability's effect of preventing meaningful access to the benefits of, or participation in, the program at issue." *Todd*, 236 F. Supp. 3d at 1311; *Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1299 (S.D. Fla. 2016). And a plaintiff does not lack "meaningful access" simply because the benefit is difficult to access. *Todd*, 236 F. Supp. 3d at 1329.

Plaintiffs' accommodation claims fail because (1) CCSD's current COVID-19 safety measures reasonably accommodate Plaintiffs' disabilities, (2) their request for a mask mandate is unreasonable, and (3) they have failed to exhaust their administrative remedies before filing suit.

### a.  CCSD has reasonably accommodated Plaintiffs.

The purpose of federal disability laws "is to place those with disabilities on an equal footing. . . ." *Kornblau v. Dade Cty*., 86 F.3d 193, 194 (11th Cir. 1996). They "do not displace the basic requirements of a public program." *Raines v. State of Fla*., 983 F. Supp. 1362, 1372 (N.D. Fla. 1997). To pass muster under Title II or Section 504, an accommodation must provide the plaintiff with meaningful access to the public benefit sought. *Todd*, 236 F. Supp. 3d at 1334. "Meaningful access does not mean equal access or preferential treatment." *Id.* (cleaned up). To prevail under a failure-to-accommodate theory, the plaintiff must show that the defendant's offered accommodations are not reasonable. *Duvall v. City of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001).

For instance, in *Chew v. Legislature of Idaho*, two state legislators sought to enjoin a legislative procedural rule that required in-person voting, arguing that remote participation would mitigate the risk of COVID-19 exposure during legislative session. 512 F. Supp. 3d 1124, 1130 (D. Idaho 2021). Both plaintiffs had

severe disabilities that made them more vulnerable to COVID-19 exposure. *Id.* at 1126. The district court rejected their argument, finding they had not demonstrated that the Legislature's other COVID-19 safety measures, *including a mask-optional policy*, were not a reasonable accommodation of their disabilities. *Id.*

Here, Plaintiffs similarly have not carried their burden of showing that the District's numerous accommodations are unreasonable or insufficient to provide meaningful access. The District has implemented a robust COVID-19 response plan adopting most of the recommendations from public health and education agencies. (Floresta Decl. ¶ 5.) The District's safety measures set forth over 50 distinct actions the District is taking to mitigate against the risk of COVID-19. (Floresta Decl. at Ex. 1-B.) The District's measures span from contact tracing, quarantine and isolation, vaccination events and education, strict cleaning and disinfection protocols, enhanced ventilation, protection partitions and physical distancing where possible, protocols for individuals with symptoms; provision of masks and strongly encouraging wearing of masks, in addition to many others.  (*Id*. ¶ 16-32.)

Even if Plaintiffs choose not to attend in-person classes, they are not excluded from or denied meaningful access to an education, because CCSD offers them the same quality educational options as non-disabled students. "There are almost 2,000 CCSD students participating in one or more of the District's virtual offerings.  Over

84% of the students enrolled in the District's virtual programs are non-disabled students." (Fuller Decl. ¶ 16.) Students have opportunities to interact with one another in many ways. The District offers virtual programs at all grade levels for students to have significant synchronous (real-time) instruction, where students can interact with teachers and peers in much the same way they would in a face-to-face classroom. (*Id*. ¶ 20.) The District's virtual programming is designed to meet national, state and District standards, is taught by highly qualified and specifically trained teachers, and delivers the services and supports needed for students with IEPs and Section 504 plans. (*Id*. ¶¶ 17, 21, 23.) All of the Plaintiffs are performing well in school, meeting grade level standards, and mostly earning As and Bs. (Coleman Decl. ¶¶ 14, 27, 37, 49.) Each of their respective 504/IEP teams has met and decided upon the appropriate supports, services, and accommodations each individual Plaintiff needs to access their education. (*Id*.)

Though Plaintiffs might prefer a mask-mandate policy, CCSD is not required to provide Plaintiffs with their preferred or optimal accommodation. *See Todd*, 236 F. Supp. 3d at 1336; *Medina*, 72 F. Supp. 3d at 1279. CCSD's COVID-related policies provide all students "the *opportunity* . . . to participate in" CCSD's educational programs. *See Medina*, 72 F. Supp. 3d at 1279 (emphasis added). If Plaintiffs choose not to attend in-person classes, that is their choice, but CCSD's

numerous safety measures and virtual offerings provide them with meaningful access to both in-person and equitable virtual instruction. Title II and Section 504 do not guarantee Plaintiffs "equal results" under CCSD's policies—only equal opportunity. *See id.* Because CCSD's COVID-19 safety measures accomplish that goal, Plaintiffs' accommodation claims fail.

### b.  Requiring CCSD to impose a mask mandate is unreasonable.

Plaintiffs' accommodation claim also fails because their request for a mask mandate is unreasonable. Title II and Section 504 only require schools to provide reasonable accommodations—not a plaintiff's requested or preferred accommodation. *Redding v. Nova Se. Univ., Inc.*, 165 F. Supp. 3d 1274, 1296-97 (S.D. Fla. 2016) (citing *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285-86 (11th Cir. 1997). School districts need not provide "the maximum…or every conceivable accommodation possible." *Alabi v. Atlanta Pub. Schs.*, No. 1:12-CV-0191-AT, 2011 WL 11785485, *8 (N.D. Ga. Sept. 26, 2011).

To prevail under a failure-to-accommodate theory, the plaintiff must prove her requested accommodation was reasonable. *Todd*, 236 F. Supp. 3d at 1334 (citing *Shannon v. Postmaster Gen. of U.S. Postal Serv.*, 335 F. App'x 21, 25 (11th Cir. 2009)). Whether a requested accommodation is legally required is a "highly fact-specific, requiring case-by-case determination." *Loren v. Sasser*, 309 F.3d 1296,

1302 (11th Cir. 2002). "An accommodation is not reasonable if it imposes undue financial and administrative burdens on the defendant or requires a fundamental alteration in the nature of the program." *Cohen v. Monroe Cty.*, 749 F. App'x 855, 857 (11th Cir. 2018) (internal quotation marks omitted).

The District has demonstrated that imposing a mask-mandate is not reasonable, because its mask protocols have not made a meaningful difference in the spread of COVID-19 within the District. Throughout the pandemic, the total incidence rate of infection in all District schools has oscillated between 0 and 1% regardless of masking requirements. (Floresta Decl. ¶ 44.) Even without a mask-mandate, Cobb County school-aged children often had the same or lower rates of infection than five neighboring mask-mandated counties. (*Id*. ¶ 41.) Cobb County's school-aged infection rate has been equal to or below the state-wide rate through this entire school year. (*Id*.) And, after extensive research, Dr. Bhattacharya has concluded that "permitting parents to opt out of a mandated mask policy is unlikely to have a significant effect on COVID disease spread and may relieve some children from the harms of masking." (Bhattacharya Decl. at Ex. 4-B Pg. 3)

Additionally, current data shows COVID-19 is on a downward trend in Cobb County and throughout District schools. The District's current incidence rate is 0.2%, the lowest it has been since school began in August. (*Id*. ¶ 42.) October 8,

2021 data shows a 78% decrease in District-reported cases since the peak this school year. (Floresta Decl. ¶ 43.) The current 7-day moving average (without a mask mandate) is 143 total cases reported compared to last year's peak of 734 with a mask mandate—an 81% drop. (*Id.* ¶ 45.)

Plaintiffs' requested mask mandate is also unreasonable because it would place an undue burden on CCSD. Plaintiffs ask this Court to order over 125,000 District students and employees to wear a mask, when none of the four Plaintiffs even attended in-person school when CCSD mandated masks. (*Id.* ¶ 4; Coleman Decl. ¶ 7.) As this Court has surely noted, the community is deeply divided over masks. The District has received over 50,000 emails, letters, phone calls, meetings, and in-person protests by parents and community members objecting to its prior mask mandate. (Floresta Decl. ¶ 47.) Responding to this level of complaints requires District administrators to divert their time and attention from other functions. (*Id.* ¶¶ 50-51.) The District was sued and has been threatened with additional lawsuits if it re-imposes its mask mandate. (*Id.* ¶ 49.) While the four Plaintiffs claim a mask-mandate will aid them in attending in-person school, the District has received the exact opposite message from numerous other parents and students who claim that the mask mandate prevented their children from attending school. (*Id.* ¶ 48.) Thus, if this Court orders a District-wide mask mandate to benefit these four Plaintiffs,

there is a good faith reason to believe that many other students, including those with disabilities, will no longer be able to attend in-person school. (*Id.*)

In arguing that mask mandates are a reasonable accommodation, Plaintiffs misconstrue the holding in *Disability Rights South Carolina v. McMaster*. There, the trial court did not order a school district to impose a mask mandate, as Plaintiffs request here. *Disability Rights S. Car. v. McMaster*, No. 3:21-02728-MGL, 2021 WL 4444841, * 6 (D. S.C. Sept. 28, 2021). Rather, it held that the State could not prohibit school districts from imposing mask mandates, instead—"allowing school districts, at their discretion" to decide whether to require masks. *Id.* Hence, *Disability Rights South Carolina* only reinforces the principle that school districts must have autonomy over their COVID-19 mask policies.

### iii. Plaintiffs' claims are barred because they did not exhaust their administrative remedies.

Under the IDEA, a school district must provide disabled students with a free appropriate public education ("FAPE"), including special education and related services. *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017). The student's IEP usually sets forth these services. *Id.* at 749. The IDEA has a detailed administrative remedial scheme to resolve FAPE-related disputes with school districts. *Id.* Under 20 U.S.C. § 1415(l), if the gravamen of a student's claim is the denial of FAPE, she must first exhaust the IDEA's administrative remedies before filing suit under the

ADA, Section 504, or other federal statutes. *Id.* at 752. A plaintiff cannot avoid this exhaustion requirement simply by suing under non-IDEA statutes. *Id.* at 754. Nor can a plaintiff plead around it by eschewing the words "FAPE", "IEP," "IDEA", or other similar terms in the complaint. *Id.* at 755.[10]

As the Supreme Court has instructed, courts apply a two-factor test to determine whether a claim is FAPE-related and therefore subject to the IDEA's exhaustion requirements. *Id.* at 756. "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say, a public theater or library?" *Id.* "[S]econd, could an adult at the school—say, an employee or visitor—have pressed essentially the same grievance?" *Id.* If the answer to both questions is no, the complaint probably concerns a denial of FAPE, and the IDEA's exhaustion requirement applies. *Id.*

Under these factors, Plaintiffs' claims challenging CCSD's mask-optional policy are really claims for a denial of FAPE and therefore subject to administrative exhaustion. Plaintiffs do not contend that the mask-optional policy deprives them of an education altogether—only that it deprives them of an *appropriate* education. [*See, e.g.*, Doc. 1 ¶ 13, 77, 86, 188, 201-02.] Plaintiffs cannot establish the first *Fry*

---

[10] This Circuit requires exhaustion regardless of the type of academic plan the child has. *See, e.g.*, *Durbrow v. Cobb Cty. Sch. Dist.*, 887 F.3d 1182, 1190 (11th Cir. 2018) (requiring exhaustion where student had a 504 plan but no IEP).

factor because their alleged injury could not arise in non-educational public setting.

Plaintiffs fare no better under the second *Fry* factor, because adults could not allege that CCSD discriminates against them when it "denies educational opportunities of an in-person education." *Hayes*, 2021 WL 4236698, at *8 ("it strains credulity for Plaintiffs to insist that an adult could bring a Complaint" alleging the denial of in-person educational benefits).

For instance, in *Hayes*, the plaintiffs sought a TRO against a mask-optional policy, alleging it violated their ADA/504 rights, and the district court denied that motion on exhaustion grounds. *See Hayes*, 2021 WL 4236698, at *3. The court noted the complaint—like here—was "replete with explicit references to alleged denials of FAPE." *Hayes*, 2021 WL 4236698, at *7. The court rejected "plaintiffs' attempt to characterize" the case as "one that involves a denial of access, and not a denial of FAPE" and refused to "avert its eyes to the obvious nature of this case." *Hayes*, 2021 WL 4236698, at *9; *see also Borishkevich*, 2021 WL 2213237 at *7.

This Court should do the same here. Plaintiffs' allegations confirm the gravamen of their lawsuit is an alleged denial of FAPE. [*See, e.g.*, Doc. 1 ¶¶ 13, 77, 86, 188, 201-02.] Because they did not exhaust their IDEA administrative remedies, their claims are now barred, and their motion should be denied.

**B. A mask optional policy will not irreparably harm Plaintiffs.**

"A showing of irreparable injury is the sine qua non of injunctive relief." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal quotation marks omitted). The absence of irreparable harm makes a preliminary injunction improper. *Id.* To show irreparable harm, the plaintiff must show that the threat of future injury is both certain and immediate rather than speculative and remote. *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008). The injury must occur *during* the litigation. *Ala. v. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). Even if a plaintiff establishes a substantial likelihood of prevailing on the merits, the court may not presume irreparable harm. *Home Legend, LLC v. Mannington Mills, Inc.*, No. 4:12-CV-237-HLM, 2013 WL 12086791, *14 (N.D. Ga. Apr. 11, 2013) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 399, 393-94 (2006)).

Plaintiffs cannot satisfy this requirement because an alleged deprivation of their preferred educational service does not justify disrupting the parties' status quo.

**i.   Plaintiffs have not shown an imminent threat of irreparable harm.**

An alleged "loss of educational opportunities" does not constitute an irreparable injury when the school has not denied educational services to students altogether. *See C.B. v. Bd. of Sch. Comm'rs of Mobile Cnty., Ala.*, 261 F. App'x at 194 (11th Cir. 2008). For instance, in *C.B. v. Board of School Commissioners*, the

plaintiff's request for a transfer from one school to another "to better address his medical needs" was denied. *Id.* at 196. He sought injunctive relief, contending the "denial of an educational benefit constitute[d] irreparable harm *per se.*" *Id*. The Eleventh Circuit rejected that argument and denied a TRO, reasoning that the school board had only placed limits on the location of the services—not denying him access to educational services altogether. *Id.*

Plaintiffs have likewise fallen woefully short of demonstrating irreparable harm. Though they contend the mask optional policy deprives them of educational opportunities [Doc. 2-1 at 23], their dissatisfaction with a virtual instruction model does not constitute *irreparable* harm. *See C.B.*, 261 F. App'x at 194; *Hayes*, 2021 WL 4236698 at *13 (district's offering of virtual learning did not irreparably harm students). And the District has clearly demonstrated that quality, non-discriminatory education opportunities are available to them. (Coleman, Decl.; Fuller Decl.)

There is also no merit to Plaintiffs' conclusory argument [*see* Doc. 2-1 at 22] that a violation of federal disability laws constitutes a *per se* irreparable harm. *See C.B.*, 261 F. App'x at 194 (rejecting plaintiff's argument that irreparable harm should be presumed when an ADA violation is alleged); *see Siegel*, 234 F.3d at 1177 (recognizing that no authority from the Supreme Court or the Eleventh Circuit has held that the irreparable injury needed for a preliminary injunction can be presumed

for a substantially likely violation of constitutional rights) (collecting cases)). The absence of irreparable harm requires denial of Plaintiffs' Motion. *See Siegel*, 234 F.3d at 1176.

> ii. **Plaintiffs are not entitled a mandatory injunction altering the status quo because they have not shown extreme injury.**

The purpose of temporary or interlocutory injunctive relief is to preserve the status quo between the parties during the litigation. *U.S. v. DBB, Inc.*, 180 F.3d 1277, 1282 (11th Cir. 1999). Where the movant—as here—seeks a mandatory injunction altering the status quo, she must meet a "heightened standard" of showing that "*extreme or serious damage* would result absent the relief." *Verizon Wireless Pers. Commc'ns LP v. City of Jacksonville, Fla.*, 670 F. Supp. 2d 1330, 1346 (M.D. Fla. 2009) (emphasis added); *see also Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156–57 (D. Or. 2018).

Plaintiffs cannot meet that heightened standard. The status quo between the parties is CCSD's mask-optional policy, which has been in place since June 2021. (Floresta, Decl. ¶ 38.) By asking this Court to require CCSD to impose a mask mandate or follow any other additional CDC guidelines not currently in place, Plaintiffs seek a mandatory injunction that would disrupt that status quo. Plaintiffs, however, have not demonstrated an "extreme" threat of "serious damage" that would justify such relief. *See Verizon*, 670 F. Supp. 2d at 1346. At most, they argue only

that they are not receiving the educational services of their choice. This, despite each of them meeting grade level standards and earning mostly As and Bs. (Coleman Decl. ¶¶ 14, 27, 37, 49.)  Accordingly, their requested relief must be denied.

### C. Enjoining CCSD's mask-optional policy would substantially harm CCSD's operations and disserve the public interest.

When the opponent of a preliminary injunction is a governmental entity, the last two Rule 65 factors (balancing of harms and public interest) merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the balance of equities tilts heavily in CCSD's favor because a court-ordered mask mandate would be unduly burdensome on CCSD's operations, and it would disserve the public interest.

### i. This Court should not interfere in local politics by supplanting CCSD's autonomy in making operational decisions about the health and safety of its students and employees.

A court-ordered mask mandate would impose substantial burdens on the CCSD. "Courts are ill-equipped to make fundamental, legislative, and administrative policy decisions which are involved in the everyday administration of a public school system." *Parents Against Realignment v. Ga. High Sch. Ass'n,* 271 Ga. 114, 114 (1999). Hence, under the Georgia Constitution, school districts fall under exclusive local control. *Gwinnett Cnty. Sch. Dist. v. Cox*, 289 Ga. 265, 710 S.E.2d 773, 775 (2011); *Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764, 772 (11th

Cir. 2014). In recognition of that principle, the State Board of Education ("SBOE") has tasked local school districts, like CCSD, with "develop[ing] policies, regulations, and procedures related to the impact of infectious diseases on school system management and operations." Ga. Comp. R. & Regs. § 160-1-3-.03(2)(a). This rule also directs school districts to provide information, education or training based on CDC guidelines and recommendations, and to make "operational decisions related to employees or students infected with communicable diseases" in conjunction with the school nurse, state and/or local public health agency representatives, health care professionals, and school system administrators." *Id.* 160-1-3-.03(2)(b), (e). But it does not mandate that the District's preventative measures must be implemented in full alignment with CDC or GDPH guidance. Nor does it impose a one-size-fits-all approach, such as a mask mandate. Instead, the CDC guidance itself is only that—guidance—and the CDC has stated, "Localities should monitor community transmission, vaccination coverage, screening testing, and occurrence of outbreaks *to guide decisions on the level of layered prevention strategies* (e.g., physical distancing, screening testing)."[11] State School Superintendent Richard Woods has reiterated that local districts have the authority

---

[11] CDC Guidance for COVID-19 Prevention in K-12 Schools available at: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html. (emphasis added)

to determine how to handle COVID-19, and that the Georgia Department of Education's ("GaDOE") role is to support whatever plan decided upon by local school districts.[12]

A court-ordered health and safety mandate would create an added administrative burden of requiring CCSD to become "enforcer" in order to comply with the Court's order—thus, taking away from CCSD's ability to focus on what has been most important: constantly responding to rapidly changing circumstances while balancing student safety with the best educational outcomes for all students.

At bottom, Georgia school districts have substantial autonomy over the creation of health and safety measures, and it severely disrupts school district operations when courts second-guess operational decision making, as they have been discouraged from doing in the past. *See Parents Against Realignment,* 271 Ga. at 114.

---

[12] Richard Woods, "Local Districts Have Authority to Chart Their Course for Upcoming School Year. Our Role is to Support Them." Press Release, Georgia Department of Education website, July 21, 2020, *available at:* https://www.gadoe.org/External-Affairs-and-Policy/communications/Pages/PressReleaseDetails.aspx?PressView=default&pid=787 ("Whatever a school district's decision, our issued guidance supports that model.")

ii.   **A District-wide mandate disserves the public interest by trying to address individualized student needs with a blanket injunction.**

Granting Plaintiffs' motion would also disserve the public interest, because a court-ordered District-wide mandate impacting over 125,000 staff and students is inconsistent with the principle of an individualized plan to accommodate the needs of disabled students on a case-by-case-basis. 28 C.F.R § 35.130(b)(7). Here, as in *Hayes*, each parent raises "unique concerns" about their child's disabilities, and "a case-by-case review of each Plaintiff's concerns would likely yield more effective solutions for each individual child than would a blanket injunction." *Hayes*, 2021 WL 4236698, at *17. "[I]t [is] ill-advised for a federal court to wade into the waters of localized education without at least affording state or local officials an opportunity to first attempt to remedy the problem and develop a record for a federal court's subsequent review." *Hayes*, 2021 WL 4236698 at *12.

The sweeping breadth of Plaintiffs' proposed injunction—a one-size fits all approach—may create even more barriers than bridges. The District will be forced to close to in-person instruction if Plaintiffs receive the totality of relief sought. (Floresta Decl. ¶ 52.) Plaintiffs' demand for a mask-mandate triggers concerns from many other parents that masks adversely impact their children's education and impede other disabled students from attending in-person school. (Floresta Decl. ¶¶ 47-48.)  *See, e.g., Fletcher v. Giant Eagle, Inc.*, No. 2:20-cv-754 NBF (W.D. Pa.

Aug. 21, 2020) (Individuals with disabilities suing under the ADA where "they suffer from respiratory limitations…which allegedly prevents them from being able to wear masks [after being] asked to leave because they were not wearing masks."). After all, the requested relief does not simply affect CCSD's policies, practices, or activities. Instead, it affects the practices of third parties, as it requires all staff and students in Cobb County schools to wear masks and removes the ability of parents to make this decision based on their child's particular needs.

## IV.    CONCLUSION

The District has made an informed choice, based on GDPH data, scientific evidence, and public-health guidance, that requiring masks in Cobb County schools does not make a meaningful difference in the local spread of COVID-19 and is outweighed by the benefits it could bring. The District will continue taking appropriate steps to mitigate and respond to COVID-19 and if the time is right, the District will amend its measures. But in the meantime, it is not the Court's role to "usurp the functions of another branch of government" in deciding how best to protect public health, as long as the measures are not arbitrary or unreasonable. *Jacobson v. Massachusetts*, 197 U.S. 11, 28, 25 S. Ct. 358, 375, 49 L. Ed. 643, 660 (1905). Moreover, the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and

protect.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1614, 207 L.Ed.2d 154 (2020) (Roberts, C.J., concurring). Granting the TRO and Preliminary Injunction Plaintiffs seek would rob the District of local discretion and control. Plaintiffs have articulated no legitimate reason for such drastic interference into the District's operations.

For the foregoing reasons, this Court should deny Plaintiffs Motion for Declaratory and Injunctive Relief and award Defendants their fees and costs for defending this action.

Respectfully submitted this the 11th day of October, 2021.

*/s/ Sherry H. Culves*
Sherry H. Culves
Georgia Bar No. 319306
Ralph Culpepper III
Georgia Bar No. 953215
Jeffrey R. Daniel
GA Bar No. 949075
*Attorneys for Defendants*

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station / 201 17th Street, NW / Suite 1700
Atlanta, GA  30363
Telephone:  (404) 322-6000
Facsimile:   (404) 322-6050
Email:  sherry.culves@nelsonmullins.com
             ralph.culpepper@nelsonmullins.com
             jeff.daniel@nelsonmullins.com

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing was prepared using Times New Roman font, 14-point type, which is one of the font and print selections approved by the Court in L.R. 5.1(C).

This the 11th day of October, 2021.

*/s/ Sherry H. Culves*
Sherry H. Culves
Georgia Bar No. 319306
Ralph Culpepper III
Georgia Bar No. 953215
Jeffrey R. Daniel
GA Bar No. 949075
*Attorneys for Defendants*

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station / 201 17th Street, NW / Suite 1700
Atlanta, GA  30363
Telephone:  (404) 322-6000
Facsimile:   (404) 322-6050
Email:  sherry.culves@nelsonmullins.com
         ralph.culpepper@nelsonmullins.com
         jeff.daniel@nelsonmullins.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day filed the within and foregoing ***Defendants'***

***Response To Plaintiffs' Motion For TRO And Preliminary Injunction*** upon all

parties of record to this matter by CM/ECF system, which will serve via e-mail

notice of such filing to any of the following counsel registered as CM/ECF users:

Michael J. Tafelski
Eugene Choi
Claire Sherburne
Brock Boone (*pro hac vice* forthcoming)
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30031-1287
(334) 956-8273
michael.tafelski@splcenter.org
eugene.choi@splcenter.org
claire.sherburne@splcenter.org
brock.boone@splcenter.org

Allison B. Vrolijk
Law Office of Allison B. Vrolijk
885 Woodstock Road,
Suite 430-318
Roswell, GA 30075
(770) 587-9228
allison@vrolijklaw.com

Craig Goodmark
Goodmark Law Firm
1425 Dutch Valley Place, Suite A
Atlanta, GA 30324
(404) 719-4848
cgoodmark@gmail.com
*Attorneys for the Plaintiffs*

This the 11th day of October, 2021.

*/s/ Sherry H. Culves*
Sherry H. Culves

Georgia Bar No. 319306
Ralph Culpepper III
Georgia Bar No. 953215
Jeffrey R. Daniel
GA Bar No. 949075
*Attorneys for Defendants*

NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station / 201 17th Street, NW / Suite 1700
Atlanta, GA  30363
Telephone:  (404) 322-6000
Facsimile:   (404) 322-6050
Email:  sherry.culves@nelsonmullins.com
          ralph.culpepper@nelsonmullins.com
          jeff.daniel@nelsonmullins.com