**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| L.E., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CHRIS RAGSDALE, *et al.*,<br><br>Defendants. | Civil Action No. 1:21-cv-04076-TCB |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**AMENDED MOTION FOR A TEMPORARY RESTRAINING**
<u>**ORDER AND PRELIMINARY INJUNCTION**</u>

Defendants[1] file this Response in Opposition to Plaintiffs' Amended Motion

for a Temporary Restraining Order and Preliminary Injunction [Doc. 74].

<u>**INTRODUCTION**</u>

Much has changed since the parties litigated the Students' first motion for

preliminary injunction. COVID infection rates in Cobb County are the lowest they

have been in nearly a year. All children above 6 months can get the COVID vaccine,

---

[1] Along with Cobb County School District ("CCSD"), the Students have sued
Superintendent Chris Ragsdale and all members of the Cobb County Board of
Education in their official capacities. Claims against government officials in their
official capacities are in reality claims against the government entity they serve.
*Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

and at least two of the Students, L.E. and B.B., are fully vaccinated. Georgia has rescinded its statewide emergency, and the federal government will soon follow suit. Recent medical research questions the effectiveness of universal indoor masking in schools. Meanwhile, CCSD has complied with all current CDC guidelines for curbing COVID transmission in schools. As for the Students, C.S. and A.Z. withdrew from CCSD months ago and enrolled elsewhere. B.B. has returned to in-person instruction. And L.E. did the same before choosing to go on hospital homebound earlier this winter ("HHB").[2]

Despite these developments, the Students' endgame remains the same. Granted, the Students give lip service to wanting a "multi-layered" approach to COVID prevention [Doc. 74-3 at 3] and have shifted from demanding strict compliance with CDC guidance to vaguely insisting that CCSD "consider" all possible accommodations [Doc. 74-1 at 11]. Even still, their only concrete demand

---

[2] HHB is an academic service designed to provide continuity between the classroom and home or hospital for students whose medical needs, either physical or psychiatric, do not allow them to attend school for a period of time. Ga. Dept. of Ed., Hospital/Homebound Services Program Overview, www.gadoe.org/Curriculum-Instruction-and-Assessment/CTAE/Pages/Hospital-Homebound-Services.aspx, (last visited March 13, 2023). Georgia's HHB regulations providing for educational programming outside the regular school building have been in place for over 3 decades. *See* Ga. Comp. R. & Regs. 160-4-2-.31.

PPAB 8675061v2

is for CCSD to turn back the clock to the early days of the pandemic and reinstitute mask mandates whenever students feel it is too dangerous to go school.[3]

The Students' quest to impose masks on unwilling CCSD students and employees suffers from two core defects. First, they lack standing to seek an injunction. Having withdrawn from CCSD, C.S. and A.Z. no longer have an adequate stake in this case's outcome to seek relief for future harm. A recent Fifth Circuit decision, *E.T. v. Paxton*, 41 F.4th 709 (5th Cir. 2022), held that the hypothetical threat of catching COVID in school does not meet Article III's injury-in-fact requirement. CCSD asks this Court to follow the Fifth Circuit's decision. And the injunction the Students seek would not redress their supposed future injury, because it would not substantially increase the chances that the Students' schools

---

[3] The Students rely on a single sentence from the CDC's current operational guidance for COVID in schools: "Schools might need to require masking in settings such as classrooms or during activities to protect students with immunocompromising conditions or other conditions that increase their risk for getting very sick with COVID-19 in accordance with applicable federal, state, or local laws and policies." Centers for Disease Control and Prevention, *Operational Guidance for K-12 Schools and Early Care and Education Programs to Support Safe In-Person Learning*, www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-childcare-guidance.html (last visited March 13, 2023). That language does not mandate masks. And even though CCSD does not permit mask mandates as accommodations, it remains committed to providing reasonable alternative accommodations that will allow students to access in-person learning. (**Exhibit 1**: Jessica Coleman Declaration ¶ 5.)

would implement mask mandates.

Second, they meet none of the preliminary injunction factors. As the Eighth Circuit recently held in *Arc of Iowa v. Reynolds*, 33 F.4th 1042 (8th Cir. 2022), COVID currently does not pose an impending threat of irreparable harm that warrants emergency injunctive relief. In addition, the Students cannot show that CCSD's mask-optional policy denies them individualized accommodations or forces them into isolated educational settings. And granting an injunction would impose unworkable administrative burdens on school administrators and staff. For all these reasons, the Students' motion should be denied.

## STATEMENT OF FACTS

### I.    COVID-19 in Cobb County in March 2023

**A. COVID transmission in Cobb County is low and trending lower.**

The most recent Georgia Department of Public Health-endorsed ("GDPH") data shows that the daily average of new COVID cases is 20 per 100,000 residents in Cobb County. And there is an average of 0.1 deaths per 100,000 resident in Cobb. *Summary of Covid-19 in Cobb County Georgia*, Emory University, https://covid19.emory.edu/13/067) (last visited March 13, 2023). Between February 20, 2023 to March 5, 2023, Cobb County reported 43 total COVID-19 cases for children age 5 to 17 years old. (**Exhibit 2**: Declaration of John Floresta ¶ 38.) That

4

data translates to a 14-day case rate of 64 cases per 100,000 Cobb County residents and reflects an overall decrease in infections. (*Id.*) The GDPH also reports that the 7-day average number of county-wide infections is 6.14 for children age 5 to 9 years old and 13.57 for children between 10 and 17 years old. (*Id.* ¶ 39.) The 7-day average is the moving average of the confirmed case counts over the previous 7 days. (*Id.*)

### B. The dominant variant is less dangerous than the Delta variant.

When this case began, the Delta variant was the main COVID threat. The Omicron variant took over as the dominant variant in the fall of 2022. Several scientific studies have proven that Omicron causes less severe symptoms, fewer hospitalizations, and fewer deaths than the Delta variant.

For example, an August 2022 NIH retrospective cohort study[4] compared the risk of death posed by Omicron and Delta. *See* Isobel Ward, *et al.*, *Risk of covid-19 related deaths for SARS-CoV-2 omicron (B.1.1.529) compared with delta (B.1.617.2):retrospective cohort study*, BMJ Clinical Research ed., Vol. 378, https://pubmed.ncbi.nlm.nih.gov/35918098/) (last visited March 8, 2023). The study, which examined over 1 million COVID infections, concluded that "infections

---

[4] A retrospective cohort study is a research study in which the medical records of groups of individuals who are alike in many ways but differ by a certain characteristic (for example, female nurses who smoke and those who do not smoke) are compared for a particular outcome (such as lung cancer).

occurring at a time when the Omicron variant was rapidly spreading were associated with *significantly less severe outcomes* than first-time infections when the Delta variant predominated." *Id.* It also found that "the risk of covid-19 death was 66% lower (95% confidence interval 54% to 75%) for omicron BA.1 compared with delta after adjusting for a wide range of potential confounders." *Id.*

Another recent NIH study compared risks of emergency department visits, hospitalization, intensive care unit admission, and mechanical ventilation in patients who were "first infected during a time period when the Omicron variant was emerging to those in patients who were first infected when the Delta variant was predominant." Lindsey Wang, *et al.*, *Comparison of outcomes from COVID infection in pediatric and adult patients before and after the emergence of Omicron*, Preprint Server for Health Sciences., Vol. 37, https://pubmed.ncbi.nlm.nih.gov/35018384/) (last visited March 7, 2023). The results showed that the "risks in the Emergent Omicron cohort outcomes were consistently less than half those in the Delta cohort." *Id*. The chart below shows the differences in outcomes for the two variants.

6

| Outcome | Emergent Omicron cohort (n=14,040) | Delta cohort (n=14,040) |
|---|---|---|
| ED visit | 4.55% (639) | 15.22% (2,137) |
| Hospitalization | 1.75% (246) | 3.95% (554) |
| ICU admission | 0.26% (36) | 0.78% (109) |
| Mechanical ventilation | 0.07% (10) | 0.43% (61) |

*Id.*

### C. Recent research challenges the effectiveness of mask mandates.

The Students' case hinges on the notion that mask mandates are supremely effective in reducing the spread of COVID in schools. But recent research suggests that facial coverings might only offer little protection from COVID—especially in schools and in community settings. For example, a 2023 multi-cluster randomized control study by Cochrane, considered worldwide to be the gold standard for meta-analytic reviews, compared the efficacy of medical and surgical masks to that of no masks in preventing the spread of viral respiratory illness. Tom Jefferson, *et al.*, *Physical interventions to interrupt the spread of respiratory viruses*, Cochrane Database of Systematic Reviews 2023, Issue 1 (last visited March 13, 2023), https://www.cochranelibrary.com/cdsr/doi/10.1002/14651858.CD006207.pub6/full ). The study concluded that "wearing masks in [community settings] probably makes

7

little or no difference to the outcome of influenza-like illness (ILI)/COVID-19 like illness compared to not wearing masks." *Id*. The Cochrane study did not conclude that masks, on an individual basis, have no effect. The study instead disputes the central premise of the Students' claims—that instructing large groups of people to wear masks appreciably reduces the COVID infections within that population.

The Cochrane study is not alone in that finding. In September 2022, the National Institute of Health published a study debunking the notion that there is a strong association between mask mandates and lower pediatric COVID-19 cases. Ambarish Chandra, Ph.D., Tracy Hoeg, Ph.D., *Lack of correlation between school mask mandates and pediatric COVID-19 cases in a large cohort*, The Journal of Infection Vol. 85, www.ncbi.nlm.nih.gov/pmc/articles/PMC9539411/#bib0003, (last visited March 13, 2023). The study challenged the data touted by the CDC to support its prior masking recommendations:

> [The] study released by the U.S. Centers for Disease Control (CDC) from Arizona found that mask requirements were associated with a reduction in COVID-19 outbreaks whilst another multi-district U.S. study reported lower in-school transmission associated with universal masking. It has, however, been difficult to rule out the possibility that these associations were a result of confounding variables rather than an effect of the masks themselves.

*Id.*

These recent studies align with the expert opinion proffered by CCSD in

response to the Students' first motion for preliminary injunction. Dr. Jay Bhattacharya, M.D, Ph.D., and Professor of Health Policy at Stanford University School of Medicine, had published six peer-reviewed publications on COVID at the time of his declaration. (Exhibit 3: Bhattacharya Declaration ¶¶ 3, 6.) Dr. Bhattacharya's research concluded, "[T]here are no high quality randomized evaluations that establish that masks on children are particularly effective in slowing disease spread." (*Id.*, Ex. 4-B at p. 3.) Rather, "[t]he highest quality observational evidence from the U.S. suggests no correlation between mandating that children wear masks and disease outcomes." (*Id.*)

### D. The government has lifted its states of emergency.

COVID state of emergencies are ending at the national, state, and county levels. Georgia rescinded its COVID state of emergency on July 1, 2021. *See* Gov. Brian Kemp Office of the Governor, *Gov. Kemp Issues Final Public Health State of Emergency Order*, gov.georgia.gov/press-releases/2021-06-22/gov-kemp-issues-final-public-health-state-emergency-executive-orderGovernor (last visited March 9, 2023). On the national level, the Biden administration last month announced that it "anticipates terminating the national emergency concerning the COVID-19 pandemic on May 11, 2023." Press Release, U.S. White House, Notice of the National Emergency Concerning the Coronavirus Disease 2019

9

PPAB 8675061v2

https://www.whitehouse.gov/briefing-room/presidential-actions/2023/02/10/notice-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic-3/ (last visited March 13, 2023).

Cobb County has also ended its COVID-19 state of emergency. In fact, the Cobb County Board of Commissioners' state of emergency the Students cite to in their Complaint [Doc. 1 ¶ 34] ended in March 2022. Cobb County Government, Communications, *Chairwoman Cupid ends COVID Declaration of Emergency early*, www.cobbcounty.org/communications/news/chairwoman-cupid-ends-covid-declaration-emergency-early (last visited March 13, 2023).

### E. Georgia law now prohibits mask mandates in schools.

About a year ago, the Georgia legislature enacted the "Unmask Georgia Students Act," now codified at O.C.G.A. §§ 20-2-59, 20-2-779.2, 20-2-2077, and 20-2-2094. Together, those statutes prohibit school systems from requiring students and employees to wear a face mask without an opt-out choice. *Id*. The law effectively prohibits schools from implementing mask mandates. The Students have not challenged these laws.

PPAB 8675061v2

## II.  CCSD Continues to Fight COVID in Schools.

### A. CCSD complies with current CDC and DPH guidelines for COVID-19 in schools.

The most recent version of the CDC Guidance[5] suggests several prevention strategies schools *may* adopt for a multi-layered approach to COVID-19. (Floresta Decl. ¶¶ 12, 29.) These suggestions include promoting equitable access to vaccines, guiding students and staff to stay home when sick and get tested, cleaning surfaces daily, and implementing screening testing for high-risk activities when community levels are high. (*Id*. ¶ 30.) While these guidelines are not mandatory, CCSD's currently complies with all of them. (*Id*. ¶ 31.)

Even still, CCSD continues to go above and beyond to keep students safe. It has implemented strict disinfection procedures, including a fogging and disinfecting system that is activated within the school or facility when a positive case is reported. (*Id*. ¶ 16.) CCSD schools follow enhanced daily cleaning procedures of offices, restrooms, breakrooms, café areas, classrooms, gyms, and other facilities. (*Id*. ¶ 17.)

---

[5] The CDC has published and repeatedly revised its Operational Guidance for K-12 Schools and Early Care and Education Programs to Support Safe In-Person Learning ("CDC Guidance"). The CDC Guidance was last updated on October 25, 2022. It underscores layering multiple prevention strategies, which CCSD has done since the pandemic started. *See* CDC Guidance, available at www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-childcare-guidance.html.

Custodial staff use specialized machines to disinfect restrooms. (*Id.*) After each class leaves the café area, all tables and chairs are wiped down and disinfected before the next class arrives. (*Id.*) Custodial staff vacuums all carpet areas with HEPA filtration vacuums, including under student desks. (*Id.*)

Hand-sanitizing stations are installed on buses, throughout schools, and in other facilities. (*Id.* ¶ 20.) Students and staff are urged to wash their hands often. (*Id.*) And CCSD instructs staff, students, and families to stay home if they are experiencing fever, chills, cough, difficulty breathing, congestion, sore throat, nausea, and other typical COVID-19 symptoms. (*Id.* ¶ 21.)

CCSD also maintains contact with CDPH and GDPH, reports confirmed or suspected cases per the reporting protocol, and follow CDPH and GDPH guidance and protocols for sick students and staff. (*Id.* ¶ 23.)

CCSD has also optimized ventilation in schools to limit transmission of illness. It regularly replaces over 27,000 air filters in its building and uses ionization devices to clean air in ventilation systems. (*Id.* ¶ 26.) CCSD's improvements in air quality meets the Environmental Protection Agency's Clean Air in Buildings Challenge, which provides basic principles and general actions recommended to improve indoor air quality in buildings and reduce the risk of airborne spread of viruses and other contaminants. (*Id.*)

12

Though this list is not an exhaustive, it captures many measures CCSD currently implements. Other measures are outlined in CCSD's Chief Strategy and Accountability Officer's Declaration. (*See id*. ¶¶ 25-46.)

### B. CCSD offers robust, effective virtual-learning options.

CCSD provides students with multiple virtual-learning options at the elementary-, middle-, and high-school levels. (**Exhibit 4**: Ryan Fuller Declaration ¶¶ 6, 7-15.) Over 1,000 CCSD students currently participate in one or more of CCSD's virtual offerings. (*Id.* ¶ 16.) While these programs are open to general-education students and students with disabilities, 77% of the students enrolled in CCSD virtual programs are non-disabled, and only a fraction of CCSD's special-needs population uses the online services. (*Id.*) Thus, any student with disabilities who uses virtual programming has the same access to educational services as their non-disabled peers. (*Id.*) Highly qualified teachers specifically trained in the delivery of online courses lead the classes. (*Id.* ¶ 17.) And the online services provide robust real-time interactions between peers and teachers, including through email, phone, text, and live video (*Id.* ¶¶ 19-21.)

### C. CCSD's stance on mask mandates.

After requiring masks during the first year of the COVID-19 pandemic, CCSD adopted a mask-optional policy for students and employees in June 2021. (Coleman

Decl. ¶ 4.) This change was due to CCSD's analysis of data from GDPH, which suggested that its prior mask mandate resulted in no meaningful reduction in COVID-19 infections in CCSD schools. (Floresta Decl. ¶ 7.) That data also showed that Cobb County's infection rate without a CCSD mask mandate was similar to counties whose local school districts mandated masks during the same time, and that CCSD incidence rates with a mask optional policy for 2021-2022 were similar to the prior year when CCSD had a mask mandate. (*Id.* ¶¶ 40-43.)

Although CCSD does not requires students or employees to wear masks, students and employees may wear them if they wish to do so in school buildings, buses, and at school events. (Floresta Decl. ¶ 18.) Masks are also available to students and visitors who do not have one. (*Id.*)

III.   **Status of the Students**

**A. C.S. and A.Z. have withdrawn from CCSD.**

C.S. and A.Z. are no longer enrolled in CCSD. Both students withdrew from CCSD at the end of the 2021-2022 school and have since enrolled other schools. (Coleman Decl. ¶¶ 7, 10.) Neither student has shown an intent to return to CCSD. (*Id.* ¶¶ 8, 11.)

PPAB 8675061v2

**B. L.E. chose to go on HHB for non-COVID-related absences after returning to face-to-face learning.**

L.E. began the 2022-2023 school year by attending school in person. (Coleman Decl. ¶ 27.) Before the start of the school year, ██████████

████████████████████████████████████████████████████████

███████████████████████

- ████████████████████████████

██ ███████████████████████████████████████

███████████████████████████████████

██ █████████████████████████████████

██ ████████████████████████████████████████

███

██ ████████████████████████████████████████

████████████████████

██ ████████████████████████████████

██ ████████████████████████████████████████

████████████████████

(*Id.* ¶ 27.)

PPAB 8675061v2

Although he did not contract COVID,[6] L.E. accumulated many absences between August and December 2022, as he had done in every prior school year, including years that pre-dated COVID. (*Id.* ¶ 28.) During the 2022-2023 school year, L.E. applied for HHB placement due to his many absences. (*Id.* ¶ 29.) CCSD approved his application, and he began HHB on January 5, 2023. (*Id.* ¶ 30.) L.E. now receives HHB instruction and services. (*Id.* ¶ 31.) ███████████████

████████████████████████████████████████████

████████████████████████ L.E. still has access to CCSD's virtual-learning services but has declined to use them. (*Id.* ¶ 32.) L.E. is welcome to return to in-person learning any time he desires.

### C. B.B. has returned to face-to-face learning.

B.B. returned to face-to-face instruction in August 2022. (Coleman Decl. ¶ 47.) Since then, he has attended more than 70% of the 129 school days.[7] (*Id.*) He also received HHB services on 14 days. (*Id.*) ████████████████

██████████ And he is progressing toward his IEP goals and objectives. (*Id.*)

---

[6] The Students admit that L.E. caught COVID during the 2021-2022 school year, when he was not attending school in person. [Doc. 74-6 ¶ 14.]

[7] B.B. alleges that he contracted COVID in October 2022. [Doc. 74-5 ¶ 15.] The Students, however, have no evidence pinpointing where he contracted the virus, including whether he caught it at school.



B.B. has used no virtual-learning services this school year even though he is eligible to use them. (*Id*. ¶ 51.)

## ANALYSIS

This brief will proceed in two parts. The first establishes that each Student lacks standing to seek a preliminary injunction. The second shows that, setting aside the standing issue, the Students meet none of the factors warranting preliminary injunctive relief under Federal Rule 65.

## I.    The Students lack standing to seek an injunction.

The Students must establish standing for this Court to have jurisdiction.

17

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Standing has three elements: (1) the plaintiff must have suffered an injury in fact, (2) the defendant must have caused that injury, and (3) a favorable decision must be likely to redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To establish an injury in fact, a plaintiff seeking injunctive relief "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.,* 247 F.3d 1262, 1284 (11th Cir. 2001). The future injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*, 578 U.S. at 339. The Students must show standing for all forms of relief they seek at each stage of the litigation. *Corley v. Long-Lewis, Inc.*, 965 F.3d 1222, 1233 (11th Cir. 2020).

All three standing elements are missing here. C.S. and A.Z. gave up a personal stake in injunctive relief when they withdrew from CCSD and enrolled in private school. L.E. and B.B., who are still CCSD students, cannot show an imminent, non-speculative threat of catching COVID. And even if they could, the injunction they seek would not redress that future injury.

### A. By withdrawing from CCSD and enrolling in private school, C.S. and A.Z. lost standing to enjoin CCSD's policies or practices.

Standing requires a plaintiff to maintain a "requisite personal interest" in the

18

PPAB 8675061v2

outcome of a case throughout its duration. *KH Outdoor, L.L.C. v. Clay Cnty., Fla.*, 482 F.3d 1299, 1302 (11th Cir. 2007). When events while a case is pending prevent a court from granting effective relief to the plaintiff, then the case must be dismissed for lack of standing. *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992). For instance, if the defendant's challenged conduct no longer affects the plaintiff's "primary conduct," then the attendant claims become moot and injunctive relief is unavailable. *See Arizonans for Official English*, 520 U.S. 43, 67 (1997).

An example of that scenario is when a student leaves his educational institution through graduation or transfer. In that event, the now-former student forfeits an adequate stake to challenge the previous school's policies and practices, which no longer pose a threat of harm—immediate or future—to him. *See Adler v. Duval Cnty Sch. Bd.*, 112 F.3d 1475, 1478 (11th Cir. 1997) (holding that students lost standing to sue their former school district when they graduated); *see also Harris v. Univ. of Massachusetts Lowell*, 43 F.4th 187, 192 (1st Cir. 2022) (finding that students who graduated or transferred lacked standing to sue former university); *Klaassen v. Trs. of Ind. Univ.*, 24 F.4th 638, 640 (7th Cir. 2022) (per curiam) (dismissing students' challenges to COVID-19 vaccination requirement as moot after students either received religious exemptions or withdrew from the university); *Cajune v. Indep. Sch. Dist.* 194, No. CV 21-1812 ADM/BRT, 2022 WL 179517, at

19

*3 (D. Minn. Jan. 19, 2022) ("Defendants argue that N.W. and Aaker lack standing because N.W. is not currently enrolled in the School District. The Court agrees."); *Doe 1 v. Baylor Univ.*, No. 6:16-CV-173-RP, 2020 WL 1557742, at *5 (W.D. Tex. Apr. 1, 2020) (no standing for equitable relief because "Plaintiffs have not demonstrated that they are likely to return" to Baylor University). Without a stake in the outcome of a case against a former educational institution, a former student lacks standing to seek equitable relief.

Beyond that, because a student would receive no immediate benefit from an injunction affecting his former school's policies, his claim is not redressable through injunctive relief. *Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist.* 61, 78 F. Supp. 2d 812, 820 (C.D. Ill. 2000), aff'd sub nom. *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist.* 61, 251 F.3d 662 (7th Cir. 2001) ("Defendants argue that Howell does not have standing to pursue this action as he has not suffered an injury which can be addressed by this court. This court agrees."). Unable to show redressability, a former student cannot seek an injunction against a former school.

C.S. and A.Z. have not been enrolled in CCSD for months. (Coleman Decl. ¶¶ 7, 10.) Having withdrawn from CCSD and enrolled in new schools, C.S. and A.Z. are unaffected by CCSD's policies. Even though C.S. and A.Z. have not graduated from high school and could reenroll with CCSD, they have signaled no plan to

20

withdraw from their current schools and go back to CCSD anytime soon. (*Id*. ¶¶ 8, 11.) In fact, C.S.'s mother testified that he is "comfortable at his new school" and that "we will not be going back to CCSD." [Doc. 74-10  ¶¶ 24-25.] A.Z.'s mother also conceded that "keeping [A.Z.] in her current school is the best option for her." [Doc. 74-2 ¶ 25.] In short, C.S. and A.Z. have presented no evidence suggesting an impending return to CCSD.

The Students bury their one-paragraph argument for C.S. and A.Z.'s standing in a footnote. [Doc. 74-1 at 13 n. 6.] But the case they mainly rely on, *31 Foster Children v. Bush*, 328 F.3d 1255 (11th Cir. 2003), cuts against them. There, a class of children alleged systemic deficiencies throughout Florida's foster-care system. *Id.* at 1261-62. The court held that the plaintiffs who remained in state custody or who had siblings in state custody had standing because they "cannot avoid exposure to the defendants' challenged conduct." *Id.* at 1266. In contrast, the plaintiffs who had left state custody, who are more like C.S. and A.Z., lacked standing because they "cannot demonstrate that their constitutional injuries are imminent." *Id.* at 1267. "They may return to the defendants' physical custody, but they may not," the court found, and if they do not, then the defendants' practices will never harm them. *Id.* In the same sense, although C.S. and A.Z. could return to CCSD, *31 Foster Children* confirms that possibility is not enough to create standing. *See id.* ("under *Lujan*, one

21

cannot merely allege that an injury will be suffered at 'some time' in the future.").

In sum, the changes in C.S. and A.Z.'s circumstances have extinguished any possibility that CCSD's masking policies might harm them. And C.S. and A.Z. will gain no cognizable redress from an injunction, which could only benefit current students. Their "requisite personal interest" in the outcome of this case has thus evaporated. *KH Outdoor, L.L.C.,* 482 F.3d at 1302. Unaffected by CCSD's policies and unable to show how an injunction would benefit them, C.S. and A.Z. cannot establish Article III standing to seek preliminary injunctive relief.

### B. The threat of injury to L.E. and B.B. is too speculative to satisfy the injury-in-fact requirement.

Unlike C.S. and A.Z., L.E. and B.B. are still enrolled in CCSD. Even so, they cannot show an injury in fact to satisfy Article III. A plaintiff cannot meet that bar by alleging he will suffer an injury at some point; the injury instead must be "*certainly* impending." *Lujan*, 504 U.S. at 564.

An increased risk of either contracting COVID in school or suffering COVID-related complications does not meet this imminency requirement. *E.T. v. Paxton*, 41 F.4th 709, 715-716 (5th Cir. 2022). In *E.T.*, a group of students challenged Texas' statewide ban on mask mandates under the ADA and Section 504, alleging it subjected them to a heightened risk of catching COVID and suffering complications

22

PPAB 8675061v2

from the virus. *Id.* at 714. Like the Students here, the *E.T.* plaintiffs alleged it was "'simply too dangerous'" to go to school without mask mandates. *Id.*

The Fifth Circuit held that was not a cognizable injury in fact. *Id.* at 715. The court emphasized it does not recognize standing "'based on a non-particularized increased risk—that is, an increased risk that equally affects the general public.'" *Id.* at 715 (citation omitted). It noted that the plaintiffs failed to show a meaningful difference in COVID infection rates between mask-optional schools and schools with mask mandates in place. *Id.* And it stressed that "[i]n light of widely available vaccines and the schools' other mitigation efforts, 'the odds' of any particular plaintiff contracting COVID-19 and subsequently suffering complications are 'speculative,' and 'the time (if ever) when any such [infection] would occur is entirely uncertain.'" *Id.* at 716 (citation omitted). Altogether, the court held, the plaintiffs could not show a "certainly impending or substantial risk" of contracting COVID in school. *Id.*

*E.T.* represents the federal courts' most recent pronouncement about the standing issues raised by the Students' motion and should guide this Court's injury-in-fact analysis. As in *E.T.*, the record here gives ample reason to doubt that L.E. and B.B. face an imminent threat of contracting COVID unless their schools adopt mask mandates. For instance, L.E. could not contract COVID at his school, because he

23

went on HHB in January 2023—as he had done many times before the pandemic—and has not returned to school since. (Coleman Decl. ¶¶ 30-31.) That aside, L.E. and B.B.'s IEPs guarantee them several accommodations aimed at lowering their risk of catching communicable diseases. (*Id.* ¶¶ 27, 49.)

On top of those Students' individual accommodations, CCSD has implemented the health and safety measures currently recommended by the CDC across the district to combat COVID transmission in schools. (*See generally*, Floresta Decl.) L.E. and B.B. are vaccinated against COVID, as are many of their peers. (Coleman Decl. ¶¶ 12, 33; Doc. 63 at 10.) Case rates in Cobb County among children between 5 and 17 years old are low and getting lower. (Floresta Decl. ¶ 38.) And even in the fall of 2021, when COVID infections were dramatically higher, state-wide infection data showed no meaningful difference between case rates in CCSD and neighboring school districts that required universal indoor masking. (*Id.* ¶ 40.) This data aligns with CCSD's expert opinion and recent research studies showing that school and community mask mandates are not making a meaningful difference in mitigating COVID spread. (*See generally* Bhattacharya Decl.)

The bottom line is that L.E. and B.B., like the plaintiffs in *E.T.*, have presented no evidence showing their chances of contracting COVID are "certainly impending." Their claims instead hinge on a conjectural, generalized risk not only

24

that they will catch COVID in school—rather than elsewhere in the community, where mask mandates have all but disappeared—but also that they will suffer irreparable health-effects from that infection. But standing cannot rest on a risk borne by the public, such as widespread communicable diseases. *See Lujan*, 504 U.S. at 573–574, (refusing to recognize standing for "generalized grievances" that are common to all members of the public). Beyond that general risk, the Students have presented no evidence that contracting COVID or suffering complications from an infection is imminent or even likely. Speculative doomsaying does not establish standing. *See Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999) ("There must be a substantial likelihood that the plaintiff will suffer future injury: a 'perhaps' or 'maybe' chance is not enough.").

### C. An injunction would not redress the Students' alleged injuries.

Even if the Students could show an injury in fact, that alone would not create standing. They must also show that a favorable decision would redress their injuries. *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

There is a mismatch between the future injury the Students allege and the relief they ask this Court to grant. Their motion for injunctive relief rests on the prospect of either catching COVID (for the second time) if they attend school in-

25

person or losing in-person education if they avoid school for fear of getting sick. Forcing other students and employees to wear facemasks, the Students contend, will alleviate that hard choice. [Doc. 74-1 at 16]. Yet the Students have modified their request and no longer seek an injunction forcing their schools to impose a mask mandate. They instead want an injunction requiring their IEP teams just to "consider" school-wide mask mandates so that the Students can go to school feeling safer from COVID. [Doc. 74-1].

That injunction would not remedy the Students' alleged harm. Enjoining CCSD's informal policy of not forcing others to mask to accommodate individual students would not guarantee any of the Students a mask mandate. The injunction the Students want would simply lead IEP teams to ponder whether to force other students and employees to wear masks among other accommodation options. But the decision to implement a mask mandate would, in the end, revert to the Students' IEP teams. That decision must be made based on the unique circumstances of each situation and cannot be predetermined. So the Students cannot present evidence showing whether these IEP teams will force other students and employees to wear masks.

And so, even if the Students could muster evidence that they face an imminent threat of catching COVID and a heightened risk of suffering worse complications

than others, the relief they want still would not provide redress. An injunction requiring IEP teams to "consider" a mask mandate would still involve considerable uncertainty about what choices the Students' IEP teams would make. The Students can only venture a guess that the injunction would heighten the chances that their schools would enact mask mandates. Such speculation does not establish redressability. *See Lewis v. Governor of Alabama*, 944 F.3d 1287, 1305 (11th Cir. 2019) (holding that the plaintiffs lacked standing to challenge a state law that voided a local ordinance raising the minimum wage, because the relief they sought did not significantly increase the likelihood their employers would pay them higher wages).

## II. The Students satisfy none of the preliminary injunction factors.

Under Rule 65, a movant must prove four factors to justify temporary or preliminary injunctive relief: (1) a substantial likelihood of success on the merits; (2) a threat of irreparable harm to the plaintiff, absent an injunction; (3) the threatened injury outweighs harm to the defendant; and (4) an injunction would the public interest. *Callahan v. U.S. Dep't of Health & Human Servs.*, 939 F.3d 1251, 1257 (11th Cir. 2019). Because preliminary or temporary injunctive relief is "an extraordinary and drastic remedy," the district court may not grant it unless the movant establishes each of these factors. *Id.*; *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). The plaintiff's burden is

27

heightened when they seek an injunction that requires action rather than prohibits conduct. *Gayle v. Meade*, No. 20-21553, 2020 WL 1949737, at \*22 (S.D. Fla. Apr. 22, 2020), *report and recommendation adopted in part*, No. 20-21553-CIV, 2020 WL 2086482 (S.D. Fla. Apr. 30, 2020), *order clarified*, No. 20-21553-CIV, 2020 WL 2203576 (S.D. Fla. May 2, 2020).

All four Rule 65 factors cut against the Students. Their risk of contracting COVID is speculative rather than imminent. They are unlikely to succeed on the merits of their claims because the Students are not entitled to an accommodation of their choice, and CCSD does not refuse to provided accommodations appropriate to the Students' unique needs. Nor does CCSD isolate disabled students from their peers. And the balancing of harms favors CCSD because requiring CCSD to implement mask mandates would disrupt the status quo, create an untenable obligation to police mask wearing by students, employees, and visitors, and impose onerous administrative burdens on school staff.

### A. *Irreparable injury*: The Students do not face an immediate risk of severe illness from COVID-19.

Not all injuries are irreparable. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). On top of that requirement, the asserted irreparable

28

PPAB 8675061v2

injury "'must be neither remote nor speculative, but actual and imminent.'" *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

The Students' entire case pivots on the premise that they face an immediate risk of severe illness from COVID if they go to school without a mask mandate. But that allegation fails for the same reasons that the Students cannot show an injury in fact. First, it is impossible for C.S. and A.Z. to contract COVID in a CCSD school when they are not enrolled in CCSD and have no plans to return. (Coleman Decl. ¶¶ 6-11.) Similarly, L.E. is receiving instruction and services at his home. (*Id.* ¶ 15.) All the Students are vaccinated or eligible for vaccination. (*Id.* ¶¶ 12, 33.) Infection rates in Cobb County are near the lowest they have been at any time since the pandemic began and are trending downward still. (Floresta Decl. ¶ 41.) CCSD has provided many accommodations to L.E. and B.B. to reduce their exposure to communicable diseases. (Coleman Decl. ¶¶ 27. 49.) And CCSD has implemented rigorous health and safety protocols—including enhancing ventilation, disinfecting surfaces, and promoting hygiene—in every school. (Floresta Decl. ¶¶ 15-28.)

Those safety measures and accommodations, together with the Students' vaccination status and the low transmission rates in Cobb County, are enough to defeat the Students' motion for injunctive relief. *See Arc of Iowa v. Reynolds*, 33 F.4th 1042, 1044 (8th Cir. 2022). In *Arc of Iowa,* the Eighth Circuit vacated a

preliminary injunction granted to a group of disabled students who, much like the Students here, challenged an Iowa statute banning mask mandates in public schools. In finding the injunction "moot," the court found that expanded vaccine access and changes to the virus have blunted the danger posed by COVID:

> The issues surrounding the preliminary injunction are moot because the current conditions differ vastly from those prevailing when the district court addressed it. COVID-19 vaccines are now available to children and adolescents over the age of four, greatly decreasing Plaintiffs' children's risk of serious bodily injury or death from contracting COVID-19 at school. Further, when Plaintiffs sought a preliminary injunction, delta was the dominant variant, producing high transmission rates and case loads throughout the country. Now, omicron has become dominant and subsided, leaving markedly lower transmission rates and case loads throughout Iowa and the country. The passage of time and acts of third parties have mooted the preliminary injunction.

*Id.* Given those developments, the court held that the plaintiffs' "risk of contracting COVID-19 at school is now low even without mask requirements, as is their risk of serious injury or death." *Id.* at 1045.[8]

---

[8] The Students try to distinguish *Arc of Iowa* by asserting that the Eleventh Circuit already decided their claims are not moot. [Doc. 74-1 at 15 n. 8.] But what the Eleventh Circuit really said is that because the Students sought full compliance with the CDC's guidelines, their claims were not moot under Article III just because the CDC guidelines no longer require a mask mandate. *See actually L.E. by & Through Cavorley v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1301 (11th Cir. 2022). Unlike *Arc of Iowa*, the Eleventh Circuit did not address whether other developments related to COVID, such as vaccinations and declining infections, rendered their allegations unfit for a preliminary injunction.

This Court should reach the same conclusion. Waving aside their vaccinations, low transmission rates in Cobb County, and CCSD's safety measures, the Students boldly speculate that they will catch COVID and stack speculation atop speculation by assuming they will suffer complications or severe illness from a future COVID infection. But like the students in *Arc of Iowa*, the Students lack evidence showing they face an imminent threat of contracting COVID at school or becoming seriously ill from an infection.

What the Students really want is for this Court to yield to their arbitrary risk tolerance and compel unwilling CCSD students, employees, and visitors to wear masks indefinitely so that the Students will *feel* safer going back to school. But a preliminary injunction requires actual evidence of imminent, irreparable harm, not mere guesswork that an injury might occur. *State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021) (recognizing that to meet the irreparable injury prong, "it is not enough simply to show some possibility of irreparable injury.") (cleaned up and citation omitted).

For all those reasons, the Students cannot show that they will suffer irreparable harm without an injunction. Their inability to meet this element is enough to deny their motion. *See Siegel*, 234 F.3d at 1176 ("A showing of irreparable injury is the sine qua non of injunctive relief.") (punctuation and citation omitted).

31

**B.** *Likelihood of succeeding on the merits*: **Neither the ADA nor Section 504 requires schools to impose—or consider imposing—mask mandates, and CCSD has not forced the Students into an isolated, segregated educational environment.**

The Students advance two disability-discrimination theories under the ADA and Section 504.[9] First, they contend CCSD violated both statutes by refusing to consider mask mandates as an accommodation option. Second, relying on *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Students accuse CCSD of isolating students with disabilities from their peers. Neither theory has merit.

> i. CCSD's refusal to grant mask mandates does not violate the ADA or Section 504.

A failure-to-accommodate claim has three elements: (1) the plaintiff is a qualified individual with a disability; (2) she is unable, because of her disability, to meaningfully access a public benefit to which she is entitled; and (3) the public entity failed, despite her request, to provide a reasonable accommodation for her disability. *Todd v. Carstarphen*, 236 F. Supp. 3d 1311, 1328 (N.D. Ga. 2017). The Students meet neither the second nor third elements.

Starting with the second element, the Students' disabilities do not prevent them

---

[9] Courts apply the same legal standards when analyzing claims under the ADA and Section 504. *J.S., III by and through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017).

from accessing in-person education. Each Student may enter their school buildings and attend class. B.B. already has. (Coleman Decl. ¶ 47.) L.E. started this school year receiving face-to-face instruction, only to choose, with endorsement from his physician, to move to HHB after he accumulated many non-COVID-related absences. (*Id.* ¶ 28.) Similarly, C.S. and A.Z. opted to remove themselves from CCSD and attend school elsewhere. (*Id.* ¶¶ 7, 10.) The Students' unease about coming to school in person is different from their inability to do so.

As for the third element, the Students stop short of directly accusing CCSD of failing to accommodate them. Instead, they contest CCSD's policy relating to mask mandates, alleging that it denies them an "individualized analysis." [Doc. 74-1 at 25.] This is a tactical move by the Students, who have failed to exhaust administrative remedies under the IDEA, which they must do before bringing a failure-to-accommodate claim. *See Babicz v. Sch. Bd. of Broward Cnty.*, 135 F.3d 1420, 1422 (11th Cir. 1998) ("claims asserted under Section 504 and/or the ADA are subject to Section 1415(f)'s requirement that litigants exhaust the IDEA's administrative procedures to obtain relief that is available under the IDEA before bringing suit under Section 504 and/or the ADA.").[10]

---

[10] Even the Students' attack on CCSD's mask-mandate policy likely must be administratively exhausted. *See Hayes v. DeSantis*, 561 F. Supp. 3d 1187, 1201 (S.D.

Setting the exhaustion issue aside, the Students give no reason to conclude that CCSD's refusal to mandate masks equates to a refusal to conduct an "individualized analysis" of what accommodations the Students should receive. CCSD's policy simply eliminates one option—a mask mandate—and retains all others. The ADA and Section 504 do not mandate a fixed menu of preset accommodations. Rather, the law allows school districts, not students, to choose what reasonable accommodations to provide. *See Todd*, 236 F. Supp. 3d at 1336 ("'[A] reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff.'") (citing *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016)); *see also Redding v. Nova Se. Univ.*, Inc., 165 F. Supp. 3d 1274, 1296–97 (S.D. Fla. 2016) (stating that a student "was entitled to only a reasonable accommodation and not necessarily the accommodation of her choice"). And school districts need not provide "every conceivable accommodation possible." *Alabi v. Atlanta Pub. Schs.*, No. 1:12-CV-0191-AT, 2011 WL 11785485, *8 (N.D. Ga. Sept. 26, 2011). CCSD is thus well within its rights to remove one possible accommodation from consideration, as long as other reasonable options remain. *E.T.*, 41 F.4th at 718.

The record leaves little doubt that CCSD has, or is willing to, provide alternative

---

Fla. 2021) (holding that students needed to exhaust administrative remedies before challenging an executive order banning no-exception mask mandates).

PPAB 8675061v2

accommodations. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████ And the Students point to no evidence suggesting that CCSD would have denied C.S. or A.Z. a case-by-case accommodation decision if they had stayed in CCSD and requested them. (*Id*. ¶ 43.) Aside from those accommodations, CCSD has taken a multi-pronged approach to COVID mitigation consistent with current CDC guidance. (Floresta Decl. ¶¶ 15-31.) The Students do not even try to show that their accommodations (or any combination of possible alternative accommodations) and CCSD's district-wide safety protocols cannot mitigate the risks of COVID to a level low enough that they feel safe to attend school. They simply prefer one accommodation—masks—to all others. The ADA and Section 504 create no right to take that "my way or the highway" stance, and the Students cannot prove that mask mandates are the *only* way to protect them from an undue risk of contracting COVID in school.

  ii. <u>CCSD has not isolated the Students away from their peers.</u>

The Students' reliance on *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), is wrong. In *Olmstead*, the Supreme Court held that unnecessary institutionalization violates the ADA. *Id.* at 597-603. The respondents in *Olmstead*, two mentally disabled

35

PPAB 8675061v2

women who were institutionalized in two state-run institutions, brought suit for injunctive relief against Georgia state officials. 527 U.S. at 593. They alleged an ADA violation after the state refused to place them in a community-based program, even though their treating physicians stated that such placement was appropriate. *Id.* at 593–94.

This case looks nothing like *Olmstead*. CCSD has neither institutionalized the Students nor forced them out of community-based placement. The Students who have participated in online learning or received services in a HHB[11] setting did so voluntarily. (Coleman Decl. ¶¶ 29, 46.) The Students have always been free to return to their schools in person whenever they choose. The Students cite no authority establishing that a student's voluntary decision to receive home-based services constitutes an *Olmstead* violation.[12]

---

[11] Whether a student receives HHB services is not an IEP team decision or contingent on what is the least restrictive environment for the student. Instead, under Georgia law, "the [LEA] shall provide HHB services to students, including students with disabilities" who meet the requirements outlined in Georgia Board of Education Rule 160-4-2.31(2) (emphasis added). So if a student applies for HHB services and meets the HHB eligibility criteria, then the school district must provide him HHB services. The role of the IEP team is just to "assist in the development of an [educational service plan (ESP)] to deliver the appropriate HHB services." Ga. Bd. of Educ. R. 160-4-2.31(3)(c).

[12] The Students cite *J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 987 (11th Cir. 2017), but the *Olmstead* claim in *J.S.* was based on

Aside from that omission, the Students do not bother to even mention B.B., C.S., or A.Z. in their sparse *Olmstead* argument. With good reason. They cannot credibly argue that B.B., who has returned to face-to-face instruction in his regular setting, is experiencing unjustifiable institutionalization or isolation away from his peers. As for, C.S. and A.Z., they are under no threat of isolation by CCSD and may re-enroll and return to face-to-face learning anytime they want.

The Students also fail to articulate a valid *Olmstead* theory for L.E. Again, the Students present no evidence that CCSD has involuntarily removed him his classroom or otherwise segregated L.E. from his peers. Even though L.E.'s school-based accommodations allow him to be away from other students for brief moments during class transitions, restroom periods, and lunch, the Students point to no authority suggesting *Olmstead's* reach is so far as to morph those accommodations into legal violations.[13] Moreover, L.E.'s *Olmstead* argument just amounts to a claim that CCSD

allegations that a school often removed a student from his classroom and isolated him in the school weight room. *J.S.* does not support an *Olmstead* claim based on a student's refusal to go to school based on fear of getting sick. Recognizing that claim would require expanding *Olmstead* far beyond its limits. Worse yet, it would flip state's HHB program on its head and undo the continuum of placement options created by the IDEA and state special education laws.

[13] It is especially confounding for the Students to assert, in one breath, that they have a right to mask mandates to protect them from COVID and, in another, argue that

is not educating him in the least restrictive environment. L.E. must exhaust administrative remedies under the IDEA before bringing such a claim. *See R.L. v. Miami-Dade Cnty. Sch. Bd.*, No. 07-20321-CIV, 2008 WL 3833414, at \*36 (S.D. Fla. Aug. 12, 2008), *aff'd*, 757 F.3d 1173 (11th Cir. 2014) (refusing to consider a student's claim that he was not educated in the least restrictive environment, because he did not administratively exhaust that issue); *see also Hernandez v. Grisham*, 508 F. Supp. 3d 893, 1005 (D.N.M. 2020), *aff'd in part, appeal dismissed in part*, No. 20-2176, 2022 WL 16941735 (10th Cir. Nov. 15, 2022) ("If a student with disabilities believes that he or she is not receiving an education in his or her LRE, the student must first exhaust the administrative process.").

### C. *Balancing the harms*: An injunction would disrupt—not preserve—the status quo, create an unworkable legal duty, and impose onerous administrative burdens.

When the opponent of a preliminary injunction is a governmental entity, the last two Rule 65 factors (balancing of harms and public interest) merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). For these factors, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*,

---

CCSD commits an *Olmstead* violation by providing L.E. an alternative location to eat lunch, a time when students must remove their masks, mandated or not.

38

555 U.S. 7, 24 (2008).

The community is deeply divided over whether to require masks in schools. When CCSD had a mask mandate in place, it received thousands of complaints, including many grievances from parents and students with disabilities that they could not attend in-person school, because wearing a mask to school all day caused harmful side effects. (Floresta Decl. ¶ 43; Exhibit 5: Sherri Hill Declaration ¶¶ 6-7.) Community opposition to mask wearing will no doubt increase if CCSD is forced to alter the status quo and reverse its mask-optional policy, which has been in place since the summer of 2021. (Hill Decl. ¶¶ 13-14.) Dealing with that opposition will cause school staff to spend considerable amounts of time that would otherwise be spent teaching or planning. (*Id.* ¶¶ 8, 14.)

On top of heightened community opposition, compelling students and employees to mask would force schools to shoulder a massive administrative burden. More than 3,000 students attend B.B. and L.E.'s schools. (Fuller Decl. ¶ 4.) Suddenly imposing a mask mandate in those schools would impress on those schools' administrators the impossible task of policing mask wearing by thousands of students. (Hill Decl. ¶¶ 11-14.) Even if the Students demanded only partial mask mandates, staff would encounter significant difficult identifying which students to mask. Parents would likely still oppose even limited masking and demand transfers

39

and exceptions. That aside, the Students have no scientific evidence establishing that a partial mandate would effectively mitigate their risk from COVID.

The Students, on the other hand, will suffer no harm without an injunction. C.S. and A.Z. are unaffected by CCSD's policies and have no stake in an injunction. Likewise, L.E. will suffer no harm with or without an injunction as long as he chooses to stay on HHB. Even if he returned to face-to-face instruction, he and B.B. have identified no increased risk of contracting COVID resulting from CCSD's mask-optional policy; and any increased risk of suffering complications from a hypothetical COVID infection is even less likely.

## **CONCLUSION**

The blast radius from granting the injunction the Students want would ripple through the public and private sector and upend current approaches toward COVID. If the Students are likely to succeed on their claims, then a mask mandate must be a reasonable modification under federal law. In that case, every school in the country risks violating the ADA and Section if it refuses to consider mask mandates as reasonable accommodations. The fallout would not be limited to schools. If the Students have a right to demand mask mandates, that right would reach every government entity, every recipient of federal funds, and ever property covered by the ADA and Section 504, including restaurants, movie theaters, libraries, hotels,

PPAB 8675061v2

grocery stores. Federal courts would need to enforce roaming mask-mandate bubbles that follow the Students and require everyone around them to wear masks. CCSD ask this Court to reject this far-reaching interpretation of the ADA and Section 504 and deny the Students' motion.

Respectfully submitted this the 13th day of March, 2023.

>*/s/ Brandon O. Moulard*
>Sherry H. Culves
>Georgia Bar No. 319306
>Brandon O. Moulard
>Georgia Bar No. 940450
>Ralph Culpepper III
>Georgia Bar No. 953215
>Jeffrey R. Daniel
>GA Bar No. 949075
>*Attorneys for Defendants*

**PARKER POE ADAMS & BERNSTEIN LLP**
1075 Peachtree Street, N.E., Suite 1500
Atlanta, GA 30309
Phone:  (678) 690-5750
sherryculves@parkerpoe.com
brandonmoulard@parkerpoe.com
ralphculpepper@parkerpoe.com
jeffdaniel@parkerpoe.com

PPAB 8675061v2

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing was prepared using Times New Roman font, 14-point type, which is one of the font and print selections approved by the Court in L.R. 5.1(C).

This the 13th day of March, 2023.

>                                         */s/ Brandon O. Moulard*
>                                         Sherry H. Culves
>                                         Georgia Bar No. 319306
>                                         Brandon O. Moulard
>                                         Georgia Bar No. 940450
>                                         Ralph Culpepper III
>                                         Georgia Bar No. 953215
>                                         Jeffrey R. Daniel
>                                         GA Bar No. 949075
>                                         *Attorneys for Defendants*

**PARKER POE ADAMS & BERNSTEIN LLP**
1075 Peachtree Street, N.E., Suite 1500
Atlanta, GA 30309
Phone:  (678) 690-5750
sherryculves@parkerpoe.com
brandonmoulard@parkerpoe.com
ralphculpepper@parkerpoe.com
jeffdaniel@parkerpoe.com

## CERTIFICATE OF SERVICE

I certify that on this 13th day of March, 2023, I filed the foregoing

*DEFENDANTS' RESPONSE TO PLAINTIFFS' AMENDED MOTION FOR A*

*TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION*

using the CM/ECF system, which will serve notice of such filing to the following

counsel:

Michael J. Tafelski                          Allison B. Vrolijk
Eugene Choi                                  Law Office of Allison B. Vrolijk
Claire Sherburne                             885 Woodstock Road,
Brock Boone                                  Suite 430-318
Southern Poverty Law Center                  Roswell, GA 30075
P.O. Box 1287                                allison@vrolijklaw.com
Decatur, GA 30031-1287
eugene.choi@splcenter.org
brock.boone@splcenter.org
csherburne@glsp.org
michael.tafelski@splcenter.org

Craig Goodmark
Goodmark Law Firm
1425 Dutch Valley Place, Suite A
Atlanta, GA 30324
cgoodmark@gmail.com


                                   */s/ Brandon O. Moulard*
                                   Sherry H. Culves
                                   Georgia Bar No. 319306
                                   Brandon O. Moulard
                                   Georgia Bar No. 940450
                                   Ralph Culpepper III
                                   Georgia Bar No. 953215

43

Jeffrey R. Daniel
GA Bar No. 949075
*Attorneys for Defendants*

**PARKER POE ADAMS & BERNSTEIN LLP**
1075 Peachtree Street, N.E., Suite 1500
Atlanta, GA 30309
Phone: (678) 690-5750
sherryculves@parkerpoe.com
brandonmoulard@parkerpoe.com
ralphculpepper@parkerpoe.com
jeffdaniel@parkerpoe.com

44